******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE NATALIE S.*
(AC 38655)

DiPentima, C. J., and Sheldon and Bear, Js.

*Argued April 4—officially released May 5, 2016***

(Appeal from Superior Court, judicial district of
Waterbury, Juvenile Matters, Turner, J.)

*Michael S. Taylor*, with whom was *Marina L. Green*,
for the appellant (respondent mother).

*Benjamin Zivyon*, assistant attorney general, with
whom were *Rachael M. Lavine*, assistant attorney general,
and, on the brief, *George Jepsen*, attorney general,
*Gregory T. D'Auria*, solicitor general, for the appellee
(petitioner).

*Joseph A. Geremia, Jr.*, for the minor child.

*Opinion*

BEAR, J. The respondent mother, Heather S.,[1] has appealed from the trial court's judgment that Natalie S., the minor child of the respondent and Matthew B. (father), was neglected, and granting custody and guardianship of her to the father.[2] The respondent sets forth two claims in her appeal. The first is that Connecticut law requires that the Department of Children and Families (department) continue efforts to reunify Natalie with her, and that the court erred in failing to order final specific steps or that the department make such additional reunification efforts. The second is that the court erred in failing to require the department to conduct further investigation into the father's fitness before granting custody and guardianship of Natalie to him and in permitting him to remove her to North Carolina. The petitioner, the Commissioner of Children and Families, disputes the respondent's claims. We affirm the judgment.[3]

In the neglect petition, the petitioner alleged, pursuant to General Statutes § 46b-120 (6), that Natalie was being denied proper care and attention, physically, educationally, emotionally, or morally, and was being permitted to live under conditions, circumstances or associations injurious to her well-being. Six days after the neglect hearing was concluded, the court issued its October 29, 2015 memorandum of decision. In that memorandum, the court set forth the following summary of the history of the case and extensive, detailed findings of fact that it found by a fair preponderance of the evidence.[4] "On April 16, 2015, the [petitioner] moved the court for an order of temporary custody of [Natalie] born [in December 2013]. [The petitioner] contemporaneously filed a neglect petition alleging that Natalie was being denied proper care and attention and was living under conditions or circumstances injurious to her well-being. [The respondent] was duly served at her usual place of abode by a state marshal on April 17, 2015, with the motion for an [order of temporary custody], the neglect petition, summons, notice, and an order to appear for hearing. Respondent father was identified as John Doe whose whereabouts were unknown.

"[The respondent] appeared on April 17, 2015, for the preliminary [order of temporary custody] hearing. She was appointed counsel and advised. Thereafter, she waived the ten day hearing, agreed to have the [order of temporary custody] sustained and entered a pro forma plea [denying the allegations of neglect]. The case was continued to May 27, 2015, for proof of service and plea by John Doe.

"On May 27, 2015, John Doe appeared. He identified himself as Matthew B. [father]. [He] was appointed counsel, advised, and a pro forma plea was entered.

Based on the results of paternity tests ordered by the court, Matthew B. was adjudicated the biological father of Natalie on July 14, 2015, and a judgment of paternity entered. On August 17, 2015, he moved the court to vacate the [order of temporary custody] and transfer guardianship and custody of Natalie to him. The motion was continued and consolidated with the neglect trial.

"The trial commenced on October 9, 2015. It continued on October 22 and thence to October 23, 2015, whereupon it concluded. [The respondent], the father, and their respective counsel were in attendance throughout the proceedings. [The petitioner] introduced numerous exhibits and testimony of two witnesses . . .  investigative social worker Luti Vinca and . . . ongoing treatment social worker Rodney Moore. [The respondent] testified, introduced two exhibits into evidence, and called two witnesses . . . a 'stay at home mom' and foster mother, and  .  .  . an expert in substance abuse counseling. The father introduced one exhibit and testified. He called no other witness[es]. The child's attorney submitted three exhibits and called no witness[es].

"The court has heard and carefully considered the testimony of all the witnesses; reviewed and carefully considered all of the exhibits; and has judicially noticed and thoroughly reviewed the verified petition. The credible and relevant evidence offered at trial, and a review of the judicially noticed court records, support the finding of the facts set forth below by a preponderance of the evidence presented."

The court proceeded to make the following factual findings: "Notice of this proceeding was provided in accordance with the Practice Book. Neither parent claims Native American tribal affiliation. The court is unaware of any proceeding pending in any other court regarding custody of the minor child. This court has jurisdiction.

"Due to reports of physical neglect, emotional neglect, substance abuse, mental health issues and criminal issues, [the department] has been involved with [the respondent] and Natalie since February 26, 2015. Three reports were received by [the department] expressing concern about [the respondent's] alleged substance abuse. On February 26, 2015, it was reported that Natalie was bitten by a dog, had two puncture wounds, was not dressed appropriately for the weather, [the respondent] kept alcohol in her purse, in her car, alcohol was smelled on her breath, and that [the respondent] had been seen driving with Natalie in her car. The allegations could not be substantiated.

"On March 7, 2015, [the respondent] was found unresponsive in her vehicle by her roommate in a Dunkin Donuts lot. [The respondent] admitted she'd taken more Ambien than prescribed. On April 16, 2015, [the respon-

dent] was arrested at 2:51 a.m. with Natalie in the car. She was charged with driving under the influence of alcohol and with risk of injury to a minor.

"[The respondent's] criminal history includes arrests for possession of a controlled substance on September 4, 2009, felony possession of a controlled substance on May 20, 2010, disorderly conduct on August 30, 2014, and possession of a controlled substance in August, 2014. She has been diagnosed with mental health issues, alcohol abuse, and has been prescribed multiple different medications.

"She has struggled with alcohol abuse for many years. By her own admission she has had 'substance issues since May 2008' and 'a significant substance abuse issue since 2012.' [The respondent] relocated with Natalie from North Carolina to Connecticut in the fall of 2014. She, admittedly, came to [Connecticut] in 2014 because she had alcohol and other substance problems and needed help. While in North Carolina she [had] received mental health treatment for anxiety, depression and [attention deficit hyperactivity disorder]. She and Natalie moved in with [the respondent's] father whom she described as bipolar and a drug addict.

"[The respondent] and the father met and began dating in Greensboro, [North Carolina] between 2011 and 2012. She refused having him listed on Natalie's birth certificate. She alleged he was very violent with her and kicked her down the stairs while she was pregnant with Natalie. She did not file a report or seek medical treatment concerning any purported abuse. Subsequently, she denied knowing the identity of Natalie's father. She reported she'd had sexual relations with multiple men while under the influence of alcohol when Natalie was conceived. [The respondent] has endeavored to have the father not be involved in Natalie's life and have no contact with her. The abuse allegations were vehemently denied by the father. [The respondent] offered no other evidence to substantiate the abuse allegations and thus they were unproven.

"[The department] made reasonable efforts prior to April 16, 2015, to prevent the removal of Natalie from her home. Natalie was placed and remains in a nonrelative foster home. She is well cared for, doing well and is medically up to date. No concerns have been noted. [The department] made reasonable efforts to reunify Natalie with both [the respondent] and the father. Natalie is completely dependent upon a consistent, stable, sober caregiver to meet her daily and emergency needs. [The department] has established that [the respondent] has failed in that regard.

"Specific steps to effectuate reunification of Natalie with [the respondent] were issued on April 23, 2015. [The department] made reasonable efforts to effectuate the reunification of Natalie with [the respondent]. [The

department] offered [the respondent] casework services, visitation services, assessment services, substance abuse evaluations, screens, breathalyzers, and mental health assessment.

"[The respondent] was admitted into an intensive inpatient treatment program at Rushford on May 5, 2015, for alcohol dependence. She completed the program on May 26, 2015. Her addiction counselor recommended she continue treatment in a relapse prevention or recovery program to keep fighting the disease. She failed to follow-up and relapsed during the weekend of July 25, 2015. She was then admitted on July 29, 2015, into a detox program followed by a twenty-eight day inpatient program. She completed the program and was admitted into an intensive inpatient treatment program. She completed the program at the McDonough House and was discharged on [August 29, 2015].

"Upon being discharged she was recommended for an intensive outpatient group . . . . Due to transportation issues presented by [the respondent], [she was afforded] the opportunity to attend a lower level relapse prevention group instead. She was to start the relapse prevention group . . . [in] September 2015. She failed to show up for the [relapse prevention group] on September 8, 2015. She failed to show up again on September 23, 2015. On September 24, 2015, she was a no show for her individual appointment with her counselor. On October 14, 2015, she again failed to show up for the [relapse prevention group].

"[The respondent] did not have stable housing prior to Natalie's birth. Nor has she had stable housing since Natalie's birth. She lived with a series of friends and boyfriends while in [North Carolina]. Upon moving to [Connecticut] she and Natalie lived with her father for a few months, until he put her out. While living with her father she exercised poor judgment by leaving Natalie at various times in the sole and unsupervised care of her father whom she alleges sexually assaulted her as a child.

"After vacating her father's house in March 2015, she and Natalie moved in with a woman (Jessica) whom she'd met at [Alcoholics Anonymous] meetings. Thereafter, she moved in with Teague, a recovering alcoholic whom she'd also met at [Alcoholics Anonymous] meetings. Teague became her boyfriend. She lived with him temporarily until she entered the [intensive outpatient] program at Rushford followed by the [intensive outpatient] program at the McDonough House. Upon being discharged from the McDonough House she found residence at the House of Hope and Change in Danbury. It is a sober house for recovering women alcoholics. [The respondent] has been a resident there since August 29, 2015. There are no children at the sober house. All parties agree it is not an appropriate residence for Natalie. [The respondent] is required to reside there for

three months. She may be discharged from the sober house on November 29, 2015. However, [the respondent] has no future housing prospects and she has no idea where she will reside after leaving the sober house.

"[The respondent] conceded during the trial that on April 16, 2015, Natalie was neglected in that she was subjected to conditions injurious to her well-being. [The respondent] admitted during the trial that she is an alcoholic and relapsed with alcohol and Ambien. [The respondent] further conceded during the trial that substance abuse has impacted her ability to care for Natalie.

"Notwithstanding the sporadic and inconsistent progress [the respondent] has made, she has not yet progressed enough with her substance abuse, mental health and housing stability to have Natalie returned to her care at this time. She has not yet achieved the degree of rehabilitation necessary. Her substance abuse and mental health continue to be major concerns after her relapse the weekend of July 25, 2015. She is currently in a dating relationship with a man whom she met at an [Alcoholics Anonymous] meeting and whom she relies upon as a source of support. She has failed to demonstrate that she is now or [could] in the reasonably foreseeable future be a consistent, stable, sober caregiver to Natalie, able to meet her daily and emergency needs.

"The father was noncustodial at the time of Natalie's removal by [the department]. [The respondent] purposefully concealed and kept her and Natalie's whereabouts from being made known to him. At a considered removal meeting with [the department] [on] or about April 28, 2015, [the respondent] identified the father for the first time as the putative father of Natalie. After being noticed, the father appeared in [Connecticut] on or prior to May 27, 2015. Prior to May 2015, he had not seen Natalie since she was a few months old. His absence in her life is due solely to [the respondent's] efforts to keep Natalie's whereabouts unknown to him. She knew he was Natalie's father. He was prevented from coming forward earlier and providing support for Natalie and presenting himself as a resource for her. He approached [the department] contending he was Natalie's biological father. He provided [the department] with a copy of the results of a paternity test done on July 1, 2013 in [North Carolina]. He has been fully cooperative with [the department] in every respect since then. No specific steps were issued for the father. [The department] did not recommend any services for him. [The department] could not identify any areas for services which he [needs]. He has been very responsive and fully cooperative with all requests made of him by [the department].

"The father recognizes the need and desires to keep [the respondent] involved in Natalie's life. He [is] willing to allow her to enjoy liberal and flexible visitation and

other contact with Natalie. He has never been married and is not in a dating relationship. He continues to reside in Greensboro, [North Carolina] with his mother and father in their home. [S]ocial worker Rodney Moore flew to Greensboro, [North Carolina] on October 15, 2015, to interview [the father's] parents and inspect their home. His parents are his support system. They are committed to helping him care for Natalie. A records check by [the department] into the background of the paternal grandparents revealed no concerns. Their home is a big single-family house situated on a large property. It is 'child proofed,' there is a bedroom fully furnished with a bed already set up for Natalie's sole use, lots of toys, clothing, and pictures. It is a safe, nurturing, and appropriate residence for Natalie.

"The father served in the U.S. Army as a parachute rigger in the 82nd Airborne Division and was honorably discharged. A background check by [the department] disclosed no criminal or domestic violence history for the father. Substance abuse test results for the father were all negative. [The respondent's] unsubstantiated allegation that he abused illegal and prescription drugs is given no weight by this court. He previously worked as a commercial scuba diver and with the Boy Scouts of America. He currently works with youth groups within his church. He is employed full-time as a horse farm manager. He earns about $20,000 a year. He has Blue Cross/Blue Shield health insurance. It is available for Natalie should she be in his care. Since May 2015, he has travelled regularly on weekends from [North Carolina] to [Connecticut] to visit Natalie. He has driven to [Connecticut] at his expense. He has travelled to [Connecticut] two times by airplane. He [has] also visited with her each time he has had to appear in [Connecticut] for court."

Accordingly, the court adjudicated Natalie neglected, vacated the order of temporary custody, and granted custody and guardianship to the father. This appeal followed.

I

The parties agree that as to the first issue, namely, whether the department had a continuing duty to provide reunification services to the respondent, the question is one of statutory construction and the standard of review is therefore plenary. See *Marchesi* v. *Board of Selectmen*, 309 Conn. 608, 614, 72 A.3d 394 (2013).

The respondent argues that the department has a continuing statutory obligation to make reasonable efforts to reunify the child with her, even after the adjudication of neglect and the awarding of custody and guardianship to the father, who was a biological parent like the mother.[5] In support of her claim, she relies on General Statutes § 46b-129 (j) (3), which provides that if custody is awarded to an individual other

than a parent or former guardian, the court shall order specific steps that the parent must take to facilitate the return of the child.[6] In this case, however, her reliance is misplaced because the court vested custody and guardianship in the father, whose underlying parental rights are equal to those of the respondent,[7] and not in the petitioner or any other related or unrelated third party.

The respondent further argues that her right to continuing services from the department not only is predicated on the specific steps language in § 46b-129 (j) (3), but that it also derives from General Statutes § 17a-111b (a). What is before this court, however, is an appeal from a neglect adjudication and disposition pursuant to General Statutes § 46b-120 et seq., including § 46b-129.[8] It is not an appeal from a termination of parental rights adjudication and disposition pursuant to General Statutes § 17a-111a[9] et seq., including § 17a-111b (a).[10] The result of the trial court's disposition is that although the father currently has custody and guardianship of Natalie, and family integrity is preserved to the maximum extent possible in the specific circumstances of this case, the respondent has not lost her right to attempt to modify the court's order to obtain a transfer of custody and guardianship to her by persuading a court that doing so is in the best interest of Natalie. See *Fish* v. *Fish*, 285 Conn. 24, 84, 939 A.2d 1040 (2008); *Knock* v. *Knock*, 224 Conn. 776, 785, 621 A.2d 267 (1993); *Hibbard* v. *Hibbard*, 139 Conn. App. 10, 20–22, 55 A.3d 301 (2012); *Malave* v. *Ortiz*, 114 Conn. App. 414, 416, 970 A.2d 743 (2009); see also General Statutes § 46b-56.

If, after a neglect adjudication, a child is committed to the care, custody, and guardianship of the commissioner pursuant to § 46b-129 (j) (2) (A),[11] the department does have a continuing statutory duty to provide reunification services. See General Statutes § 17a-111b (a). This duty, however, does not exist when the dispositional award of custody and guardianship is to a parent.[12] In *In re Pedro J. C.*, 154 Conn. App. 517, 538–39, 105 A.3d 943 (2014), this court stated: "In this case, the commissioner did not recommend or advocate for any particular custodial option. The court in this case chose the second option [a relative pursuant to § 46b-129 (j) (2) (B)] as being in the . . . best interest [of the petitioner, Pedro J. C., a seventeen year old child] and transferred custody and guardianship [of him] to [a cousin]. Such a disposition deprived the court of continuing jurisdiction to promote the reunification with the respondent [mother] it subsequently found viable. A transfer of guardianship to someone other than a parent results in the cessation of any requirement that reunification efforts be made, and we fail to see how reunification, when contemplated in state child protection proceedings, remains viable when no state agency is authorized to make reasonable efforts toward reunification . . . . A decision to remove a child from parental

custody in a neglect proceeding is not always subject to periodic judicial review to assess the well-being of the child and to approve a permanency plan for the child's care and custody, whether that be reunification with the parent, adoption, a transfer of guardianship, or long-term foster care within a year of removal. The periodic judicial review described in § 46b-129 applies only if the child is committed to the custody of the department. The legislature . . . did not contemplate mandatory, periodic judicial review of cases in which custody, rather than ordered as a commitment of the child to [the department, has] been vested by the court in an appropriate third party . . . . *Fish* v. *Fish*, [supra, 285 Conn. 83]. Once the court decided to transfer custody and guardianship to [the cousin], the only way reunification [with the respondent] would be restored to viability would be if the respondent opposed that dispositional status and either appealed or subsequently filed a petition to reinstate her guardianship of the child.[13] General Statutes § 46b-129 (n) . . . .

"Accordingly, we conclude that the court's failure to find that reunification with the respondent was not viable due to neglect under state law was erroneous as a matter of law because it was internally inconsistent with the court's dispositional order on the neglect petition, which transferred the custody and guardianship of the petitioner to [the cousin]." (Footnotes altered; internal quotation marks omitted.) *In re Pedro J. C.*, supra, 154 Conn. App. 538–39.

The principles set forth in *In re Pedro J. C.* are applicable both in the context of a transfer of custody and guardianship from one parent to the other, and in the context of a transfer of custody and guardianship from the petitioner to a biological parent as a dispositional result of a neglect proceeding. The court's disposition in the present case awarding custody and guardianship to the father deprived it of continuing jurisdiction over the respondent's possible future reunification with Natalie and thus required the cessation of such reunification efforts.

## II

The respondent's second claim is that the court erred in failing to require further investigation of the father's fitness to parent before granting custody and guardianship to him and permitting him to remove Natalie to North Carolina, and that such further investigation was required by the department's duty to make reasonable efforts toward reunification of the respondent with Natalie.[14] The respondent argues that there was both statutory authorization and a factual basis for such further investigation of the father.

We review the court's findings of fact under the clear error standard. "A finding of fact is clearly erroneous when there is no evidence in the record to support it

. . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Bender* v. *Bender*, 292 Conn. 696, 728–29, 975 A.2d 636 (2009). We give plenary review to the respondent's claims of statutory construction and application in support of her second claim. See *Marchesi* v. *Board of Selectmen*, supra, 309 Conn. 614.

The respondent argues that the petitioner's alleged "failure to conduct an adequate investigation implicates the trial court's conclusions concerning [the department's] obligation to make reasonable efforts before removing a child from the home." The respondent also asserts that "[t]here is no dispute that, before removing a child from her custodial parent, [the department] must make reasonable efforts to avoid the removal,"[15] and "[t]his obligation applies in the context of a neglect petition as well as a petition for termination, and includes the obligation, in the context of this case in particular, to perform a thorough investigation before removing a child and placing her out of state." It is not disputed, however, that the department provided substantial services to the respondent and Natalie for several months after the filing of the neglect petition in April, 2015, through late October, 2015. To the extent, however, that the "reasonable efforts" that the respondent asserts are required include the department's performance of such a "thorough investigation," she has not cited any relevant authority for this proposition.[16] She does cite in support of her claim General Statutes § 17a-112, which describes standards and requirements for the termination of parental rights, and *In re Jason M.*, 140 Conn. App. 708, 720–21, 59 A.3d 902, cert. denied, 308 Conn. 931, 64 A.3d 330, cert. denied sub nom. *Charlene P.* v. *Connecticut Dep. of Children & Families*, U.S. , 134 S. Ct. 701, 187 L. Ed. 2d 564 (2013), an appeal from a termination of parental rights. The respondent, however, acknowledges that we held in *In re Pedro J. C.*, a neglect proceeding, that the department has no continuing obligation to make further reasonable efforts[17] toward a respondent's reunification with a child if custody and guardianship of such child is not committed by the court to the petitioner. To the extent the respondent claims that a "thorough investigation" of the father was required to be made in this case by the department as part of its "reasonable efforts" to reunify the respondent with Natalie, we reject that claim.

The respondent also argues that there was substantial factual evidence calling the father's fitness into question. She, however, in her brief "does not contend that this evidence required that the trial court find the father unfit, or find even that the alleged events had occurred. The significance of this evidence was only in that it should have triggered in the petitioner an obligation (and from the trial court, an order) to do a thorough investigation into the father's fitness before allowing Natalie to be removed from [the respondent] and moved to North Carolina with him." The respondent then set forth her unsubstantiated and unproven allegations about the father that were not found as fact by the court, and she made unsupported allegations about the department's activities or lack thereof relating to its investigation of the father's fitness to be a custodial parent and guardian of Natalie. The respondent does not assert that any specific fact found by the court is clearly erroneous. She did not offer any specific evidence in the neglect hearing to support her claims about the department's failure to perform any required additional investigation of the father.

The respondent additionally argues that the court could have entered orders, pursuant to its authority recognized in *In re Emoni W.*, 305 Conn. 723, 741, 48 A.3d 1 (2012), placing conditions on the father's exercise of custody. The court's findings of fact set forth previously in this opinion do not provide any support for her allegations about the father's lack of fitness, and the court did not credit them. The court instead found that the father did not have custody of Natalie at the time of her removal by the department. He had not come forward earlier to provide support for Natalie or to present himself as a resource for her because the respondent had purposefully kept Natalie's whereabouts from being known to him. Since receiving notice, the father appeared in Connecticut and provided evidence of his paternity. He has been fully cooperative with the department in every respect since then. No specific steps were ordered for him by the court and the department could not identify any areas for which he had need for services.

The court further found: "The father recognizes the need and desires to keep [the respondent] involved in Natalie's life. He [is] willing to allow her to enjoy liberal and flexible visitation and other contact with Natalie. He has never been married and is not in a dating relationship. He continues to reside in Greensboro, [North Carolina] with his mother and father in their home. [S]ocial worker Rodney Moore flew to Greensboro, [North Carolina] on October 15, 2015, to interview [the father's] parents and inspect their home. His parents are his support system. They are committed to helping him care for Natalie. A records check by [the department] into the background of the paternal grandparents

revealed no concerns. Their home is a big single-family house situated on a large property. It is 'child proofed,' there is a bedroom fully furnished with a bed already set up for Natalie's sole use, lots of toys, clothing, and pictures. It is a safe, nurturing, and appropriate residence for Natalie.''

On the basis of these findings, which the respondent does not claim were clearly erroneous, we cannot conclude that the trial court erred in declining to enter orders placing conditions on Natalie's placement with the father pursuant to its authority recognized in *In re Emoni W*, supra, 305 Conn. 736–37, 741. Moreover, the respondent has failed to establish on appeal that, after the court's adjudication of neglect and dispositional award of custody and guardianship to the father, instead of commitment of the child to the care, custody and guardianship of the petitioner, the department has any statutory duty or authority to continue its activities with or for the respondent, the father or Natalie. See *In re Pedro J. C*., supra, 154 Conn. App. 538–39.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** May 5, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The mother is referred to herein as the respondent. The father, Matthew B., although also a respondent in the neglect proceeding, did not appeal and for convenience is referred to herein as the father.

[2] The court "granted temporary/nonpermanent custody and guardianship of Natalie" to the father. Such award is referred to herein as custody and guardianship.

[3] Pursuant to Practice Book § 67-13, the attorney for the minor child filed a statement on March 4, 2016, adopting the petitioner's brief in opposition to the respondent's appeal.

[4] The standard of proof applicable to nonpermanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence. *In re Joseph W*., 305 Conn. 633, 645, 46 A.3d 59 (2012); *In re Kamari C-L*., 122 Conn. App. 815, 825, 2 A.3d 13, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010).

[5] The petitioner responds that the primary issue in this case is whether the department is obligated to continue its involvement in the lives of Natalie and her parents after the adjudication of neglect and the placing of her primary care, custody and guardianship with a parent who was found by the court to be worthy, suitable and appropriate to assume those responsibilities. The petitioner argues that "[i]n such a case, when the child is placed with a suitable and worthy parent and the trial court has not found any other concerns warranting further oversight, we should expect state intervention to end."

[6] General Statutes § 46b-129 (j) (3) provides: "If the court determines that the commitment should be revoked and the child's or youth's legal guardianship or permanent legal guardianship should vest in *someone other than the respondent parent, parents or former guardian*, or if parental rights are terminated at any time, there shall be a rebuttable presumption that an award of legal guardianship or permanent legal guardianship upon revocation to, or adoption upon termination of parental rights by, any relative who is licensed as a foster parent for such child or youth, or who is, pursuant to an order of the court, the temporary custodian of the child or youth at the time of the revocation or termination, shall be in the best interests of the child or youth and that such relative is a suitable and worthy person to assume legal guardianship or permanent legal guardianship upon revoca-

tion or to adopt such child or youth upon termination of parental rights. The presumption may be rebutted by a preponderance of the evidence that an award of legal guardianship or permanent legal guardianship to, or an adoption by, such relative would not be in the child's or youth's best interests and such relative is not a suitable and worthy person. The court shall order specific steps that the parent must take to facilitate the return of the child or youth to the custody of such parent." (Emphasis added.)

[7] Our Supreme Court in *Fish* v. *Fish*, 285 Conn. 24, 40–41, 939 A.2d 1040 (2008), discussed the rights of parents with respect to their children: "In discussing the constitutional basis for the protection of parental rights, the United States Supreme Court observed in *Troxel* [v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)], that [t]he liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this [c]ourt. More than [seventy-five] years ago, in *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401 [43 S. Ct. 625, 67 L. Ed. 1042] (1923), we held that the liberty protected by the [d]ue [p]rocess [c]lause includes the right of parents to establish a home and bring up children and to control the education of their own. Two years later, in *Pierce* v. *Society of Sisters*, 268 U.S. 510, [534–35, 45 S. Ct. 571, 69 L. Ed. 1070] (1925), we again held that the liberty of parents and guardians includes the right to direct the upbringing and education of children under their control. . . . We returned to the subject in *Prince* v. *Massachusetts*, 321 U.S. 158 [64 S. Ct. 438, 88 L. Ed. 645] (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Id., [166]. . . . *Troxel* v. *Granville*, supra, 530 U.S. 65–66. In light of this extensive precedent, it cannot now be doubted that the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. Id., 66." (Internal quotation marks omitted.) *Fish* v. *Fish*, supra, 40–41.

"Connecticut courts likewise have recognized the constitutionally protected right of parents to raise and care for their children." Id., 41. To the extent that the respondent argues that such constitutional rights are only for her benefit or otherwise ignores the father's equal rights as a parent, she is incorrect.

[8] An adjudication of neglect is a determination of the status of the child: "The focal point of a neglect petition is not condemnation of the parents, but, rather, the status of the child." *In re Allison G.*, 276 Conn. 146, 164, 883 A.2d 1226 (2005).

[9] General Statutes § 17a-111a provides: "(a) The Commissioner of Children and Families shall file a petition to terminate parental rights pursuant to section 17a-112 if (1) the child has been in the custody of the commissioner for at least fifteen consecutive months, or at least fifteen months during the twenty-two months, immediately preceding the filing of such petition; (2) the child has been abandoned as defined in subsection (j) of section 17a-112; or (3) a court of competent jurisdiction has found that (A) the parent has killed, through deliberate, nonaccidental act, a sibling of the child or has requested, commanded, importuned, attempted, conspired or solicited to commit the killing of the child or a sibling of the child; or (B) the parent has assaulted the child or a sibling of a child, through deliberate, nonaccidental act, and such assault resulted in serious bodily injury to such child.

"(b) Notwithstanding the provisions of subsection (a) of this section, the commissioner is not required to file a petition to terminate parental rights in such cases if the commissioner determines that: (1) The child has been placed under the care of a relative of such child; (2) there is a compelling reason to believe that filing such petition is not in the best interests of the child; or (3) the parent has not been offered the services contained in the permanency plan to reunify the parent with the child or such services were not available, unless a court has determined that efforts to reunify the parent with the child are not required."

[10] General Statutes § 17a-111b (a) provides: "The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required pursuant to subsection (b) of this section or subsection (j) of section 17a-112, or (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129."

[11] General Statutes § 46b-129 (j) (2) provides in relevant part: "Upon finding and adjudging that any child or youth is uncared for, neglected or abused the court may (A) commit such child or youth to the Commissioner of Children and Families, and such commitment shall remain in effect until further order of the court, except that such commitment may be revoked or parental rights terminated at any time by the court . . . ."

[12] It is undisputed that the court issued temporary specific steps to the respondent pursuant to § 46b-129 (c) at the initial hearing in the present case, and that the department provided reunification services to her through the hearing on the neglect petition, during which it became clear to the court that it was in the best interest of the child for custody and guardianship to be awarded to the father.

[13] Although in this case the respondent has appealed the court's judgment, she did not seek to have either custody or guardianship of Natalie granted to her, presumably because of her reasonable recognition that, in view of her unfortunate circumstances and need to concentrate on dealing with her own issues and problems, thus attending to her own possible rehabilitation, she was not then a suitable candidate to have the custody and guardianship of Natalie, and it was unclear if or when she might be a suitable candidate in the future. She thus was not in a position to be restored to viability, and she did not appeal the decision of the court not to award custody and guardianship to her.

[14] The respondent again relies on our state law relating to the termination of parental rights: "In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification. . . . General Statutes § 17a-112 (j) (1). The standard for reviewing reasonable efforts has been well established by the Appellate Court. Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, [§ 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004).

There is no similar requirement of proof of reasonable efforts prior to an adjudication of neglect and subsequent disposition either of commitment to the petitioner or of custody to a biological parent. See, e.g., General Statutes § 46b-129.

[15] In the present case, however, Natalie was removed pursuant to an ex parte order of temporary custody. At the subsequent hearing, the respondent did not contest the ex parte order, and it was sustained by the court.

[16] The petitioner, however, "has the authority and the responsibility to investigate whether the placement of a particular child with an out-of-state parent would be consistent with the public policy goals underlying the [the Interstate Compact on the Placement of Children] when the child is under the petitioner's care and supervision and there is evidence rebutting the presumption of fitness." *In re Emoni W.*, 305 Conn. 723, 737, 48 A.3d 1 (2012). Our Supreme Court also stated that "it is essential to note that both the respondent and the petitioner agree that, if a child is in the custody of the petitioner, an out-of-state parent must appear at the preliminary hearing concerning the placement of the child, answer questions and agree to reasonable conditions on the placement of the child with the parent. Moreover, when there is evidence before the court that an out-of-state, noncustodial parent is unfit, the parties agree that the court should not place a child with the parent without ordering an investigation into the parent's fitness. They disagree only about whether the petitioner can conduct that investigation or, instead, the analogous agency in the receiving state must conduct it pursuant to [General Statutes] § 17a-175. At oral argument before this court, the petitioner conceded that she has the authority and the ability to conduct an investigation of an out-of-state parent, although she might encounter difficulties that would not be present in cases in which she investigates a parent who is living in state. Indeed, our statutes provide a panoply of

procedures to ensure that a child under the care and supervision of the petitioner is not placed in the custody of an unfit parent and that, if a parent is granted custody, there can be continued protective supervision. Accordingly, our conclusion in the present case that § 17a-175 does not apply to out-of-state parents does not leave the trial court or the petitioner without a remedy when faced with evidence that an out-of-state parent is unfit." (Footnotes omitted.) Id., 741–42. In the present case, however, the court determined that there was no evidence that the father was unfit.

[17] See footnote 14 of this opinion.

---