******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE NATALIE S.*
(SC 19707)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa and Vertefeuille, Js.

*Argued January 24—officially released June 6, 2017*

*Michael S. Taylor*, assigned counsel, with whom was *Marina L. Green*, assigned counsel, for the appellant (respondent mother).

*Benjamin Zivyon*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellee (petitioner).

*Joshua Michtom*, assistant public defender, for the appellee (respondent father).

*Joseph A. Geremia, Jr.*, for the minor child.

*Opinion*

EVELEIGH, J. In this certified appeal, the respondent mother, Heather S., appeals from the judgment of the Appellate Court affirming the judgment of the trial court adjudicating the minor child, Natalie S., neglected and granting temporary custody and guardianship to the respondent father, Matthew B.[1] On appeal to this court, the respondent asserts that the Appellate Court incorrectly concluded that the Department of Children and Families (department) was not required to provide reunification efforts to her in the present case because the father was awarded temporary guardianship of Natalie. The petitioner, the Commissioner of Children and Families, asserts that the department was not required to continue providing reunification efforts to the respondent because the trial court granted custody and guardianship to the father. We affirm the judgment of the Appellate Court.[2]

The opinion of the Appellate Court sets forth the following facts and procedural history that are relevant to this appeal. "In the neglect petition, the petitioner alleged, pursuant to General Statutes § 46b-120 (6), that Natalie was being denied proper care and attention, physically, educationally, emotionally, or morally, and was being permitted to live under conditions, circumstances or associations injurious to her well-being. . . . [The neglect petition, identified the father] as John Doe [and indicated that his] whereabouts were unknown. . . .

"[Thereafter, the father] appeared. He identified himself . . . was appointed counsel, advised, and a pro forma plea was entered. [On the basis of results from] paternity tests ordered by the court, [the father] was adjudicated [to be Natalie's biological father] on July 14, 2015, and a judgment of paternity entered. On August 17, 2015, he moved the court to vacate [a previous order of temporary custody] and transfer guardianship and custody of Natalie to him. The motion was continued and consolidated with the neglect trial. . . .

"[At the neglect trial, the petitioner and the respondent presented witnesses and exhibits.] The father introduced one exhibit and testified." (Footnote omitted; internal quotation marks omitted.) *In re Natalie S.*, 165 Conn. App. 604, 607–609, 139 A.3d 824 (2016). "[The trial court subsequently determined that the respondent had] failed to demonstrate that she is now or [could] in the reasonably foreseeable future be a consistent, stable, sober caregiver to Natalie, able to meet her daily and emergency needs.

"The father was noncustodial at the time of Natalie's removal by [the department]. [The respondent] purposefully concealed and kept her and Natalie's whereabouts from being made known to him. At a . . . meeting with [the department on] or about April 28,

2015, [the respondent] identified the father for the first time as the putative father of Natalie. After being noticed, the father appeared in [Connecticut] on or prior to May 27, 2015. Prior to May 2015, he had not seen Natalie since she was a few months old. His absence in her life is due solely to [the respondent's] efforts to keep Natalie's whereabouts unknown to him. She knew he was Natalie's father. He was prevented from coming forward earlier and providing support for Natalie and presenting himself as a resource for her. He approached [the department] contending he was Natalie's biological father. He provided [the department] with a copy of the results of a paternity test done on July 1, 2013 in [North Carolina]. He has been fully cooperative with [the department] in every respect since then. No specific steps were issued for the father. [The department] did not recommend any services for him. [The department] could not identify any areas for services which he [needs]. He has been very responsive and fully cooperative with all requests made of him by [the department].

"The father recognizes the need and desires to keep [the respondent] involved in Natalie's life. He [is] willing to allow her to enjoy liberal and flexible visitation and other contact with Natalie. He has never been married and is not in a dating relationship. He continues to reside in [North Carolina] with his [parents]. [A social worker from the department, Rodney Moore] flew to [North Carolina] on October 15, 2015, to interview [the father's] parents and inspect their home. His parents are his support system. They are committed to helping him care for Natalie. A records check by [the department] into the background of the paternal grandparents revealed no concerns. Their home is a big single-family house situated on a large property. It is childproofed, there is a bedroom fully furnished with a bed already set up for Natalie's sole use, lots of toys, clothing, and pictures. It is a safe, nurturing, and appropriate residence for Natalie.

"The father served . . . as a parachute rigger in the 82nd Airborne Division [of the United States Army] and was honorably discharged. A background check by [the department] disclosed no criminal or domestic violence history for the father. Substance abuse test results for the father were all negative. [The respondent's] unsubstantiated allegation that he abused illegal and prescription drugs is given no weight by this court. He previously worked as a commercial scuba diver and with the Boy Scouts of America. He currently works with youth groups within his church. He is employed full-time as a horse farm manager. He earns about $20,000 a year. He has . . . health insurance. It is available for Natalie should she be in his care. Since May 2015, he has travelled regularly on weekends from [North Carolina] to [Connecticut] to visit Natalie. He has driven to [Connecticut] at his expense. He has travelled to [Connecti-

cut] two times by airplane. He [has] also visited with her each time he has had to appear in [Connecticut] for court." (Internal quotation marks omitted.) Id., 613–15.

Accordingly, the trial court concluded as follows: "[The department] has established by a preponderance of the evidence adduced at trial that grounds for an adjudication of neglect . . . do exist in that Natalie . . . has been denied proper care and attention and . . . has been permitted to live under conditions injurious to her well-being. The [father] was noncustodial at the time of the neglect. He was without knowledge or information as to the existence of the neglect and was [wilfully] prevented by [the respondent] from acquiring such knowledge. [The department] made reasonable efforts to reunite Natalie with both [the respondent and the father]. It is not in [Natalie's] best interest to be committed to the care and custody of [the department]. [A] [c]ause for [the] commitment of Natalie . . . to [the department] has not been proven to exist. The [father] is a worthy, suitable and appropriate person to be granted custody and guardianship of Natalie . . . . It is in [Natalie's] best interest for the [father] to be granted temporary custody and guardianship of her." As a result, the trial court adjudicated Natalie neglected, vacated the order of temporary custody to the department, and granted "temporary/nonpermanent custody and guardianship" to the father.

Thereafter, the respondent appealed from the judgment of the trial court to the Appellate Court. In that appeal, the respondent claimed that: (1) the department was required to continue efforts to reunify Natalie with her, and that the trial court incorrectly failed to order final specific steps or that the department make such additional reunification efforts; and (2) the trial court incorrectly failed to require the department to conduct further investigation into the father's fitness before granting custody and guardianship of Natalie to him and in permitting him to remove her to North Carolina. *In re Natalie S.*, supra, 165 Conn. App. 604. The Appellate Court concluded that the trial court did not incorrectly fail to order the department to make additional reunification efforts because "[t]he court's disposition in the present case awarding custody and guardianship to the father deprived it of continuing jurisdiction over the respondent's possible future reunification with Natalie and thus required the cessation of such reunification efforts." Id., 621. Further, the Appellate Court also concluded that "[o]n the basis of the [trial court's factual findings regarding the father's fitness], which the respondent does not claim were clearly erroneous, we cannot conclude that the trial court erred in declining to enter orders placing conditions on Natalie's placement with the father pursuant to its authority . . . ." Id., 626.

Thereafter, the respondent filed a petition for certification to appeal, which this court granted, limited to

the following issue: "Did the Appellate Court correctly determine that continuing reunification efforts for the respondent . . . were not required because temporary guardianship had been placed with the father?" *In re Natalie S.*, 321 Conn. 928, 138 A.3d 287 (2016).

The sole issue on appeal is whether the trial court was required to order the department to continue reunification efforts despite awarding custody and guardianship to the father. Accordingly, resolution of this appeal requires us to construe General Statutes § 17a-111b[3] and the related statutory scheme.

We begin with the standard of review and well established general principles. This case presents a question of statutory construction, an issue of law over which we exercise plenary review. *Cales* v. *Office of Victim Services*, 319 Conn. 697, 701, 127 A.3d 154 (2015). In determining the meaning of a statute, we look first to the text of the statute and its relationship to other statutes. General Statutes § 1-2z. If the text of the statute is not plain and unambiguous, we may consider extra-textual sources of information such as the statute's "legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Doe* v. *Boy Scouts of America Corp.*, 323 Conn. 303, 332, 147 A.3d 104 (2016). Our fundamental objective is to ascertain the legislature's intent. Id.; see also *Chestnut Point Realty, LLC* v. *East Windsor*, 324 Conn. 528, 533, 153 A.3d 636 (2017).

We begin by examining the statutory text. Section 17a-111b (a) provides as follows: "The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required pursuant to subsection (b) of this section or subsection (j) of section 17a-112, or (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129." The respondent asserts that the plain language of the statute required that the department provide reunification efforts with her because the trial court neither determined that such efforts were not required pursuant to General Statutes § 17a-112 nor had it approved a permanency plan pursuant to General Statutes § 46b-129 (k). The department counters that the plain language of § 17a-111b (a), when considered in light of the other relevant statutes, does not require reunification efforts with the respondent in the present case because custody and guardianship was awarded to the other parent.

The plain language of § 17a-111b (a) provides that the department is required to make reasonable efforts to reunify the child with one parent. Specifically, § 17a-111b (a) provides that the department "shall make rea-

sonable efforts to reunify *a parent* with a child" unless certain conditions are met. (Emphasis added.) By employing this language, the legislature demonstrated that the department is required to make efforts to reunify a child with one of his or her parents. The fact that the legislature chose to use the singular form indicates that it intended reunification efforts toward one parent would satisfy the requirements of the statute and that, if reunification was accomplished with one parent, further reunification efforts would not be required. See, e.g., *McCullough* v. *Swan Engraving, Inc.*, 320 Conn. 299, 308, 130 A.3d 231 (2016) ("[t]he fact that the legislature chose to use the singular form of notice of claim in this provision indicates that it intended that a singular notice of [a worker's compensation] claim would satisfy the requirements of the statute and that further claims would not require additional notice").

Furthermore, § 17a-111b (a) must be read consistently with the statutory scheme of which it is a part. "It is axiomatic that, when interpreting the terms of one statute, we are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . Legislation never is written on a clean slate, nor is it ever read in isolation or applied in a vacuum. Every new act takes its place as a component of an extensive and elaborate system of written laws. . . . Construing statutes by reference to others advances [the values of harmony and consistency within the law]. In fact, courts have been said to be under a duty to construe statutes harmoniously where that can reasonably be done. . . . Moreover, statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *State* v. *Agron*, 323 Conn. 629, 638, 148 A.3d 1052 (2016).

As this court has repeatedly recognized, "[a] neglect petition and concomitant request for an order of commitment are not a typical civil action. A neglect petition is sui generis and, unlike a complaint and answer in the usual civil case, does not lead to a judgment for or against the parties named. . . . In such proceedings, the petitioner acts not to vindicate her personal rights but, acting for the state as parens patriae, to ensure, first and foremost, the child's safety and, second, a permanent placement of the child as expeditiously as possible. . . . The petitioner does not seek the monetary or equitable relief of a typical civil action, but, rather, actions by the court that will further the dual goals of safety and permanency." (Citations omitted; internal quotation marks omitted.) *In re Allison G.*, 276 Conn. 146, 158–59, 883 A.2d 1226 (2005).

This court has also explained that "[t]he adjudication and findings also have significance in that, *if they result*

*in an order of commitment*, they also trigger a requirement that the court issue specific steps for reunification. . . . Although the specific steps provide a benchmark by which the court measures whether either reunification or termination of parental rights is appropriate, the court necessarily will consider the underlying adjudication and the attendant findings." (Citations omitted; emphasis added.) Id., 160–61.

In furtherance of these dual goals of safety and permanency, however, our statutory scheme offers alternatives to commitment of the child to the care and custody of the department. Specifically, § 46b-129 (j) (2) provides in relevant part that "[u]pon finding and adjudging that any child or youth is uncared for, neglected or abused the court may . . . (B) vest such child's or youth's legal guardianship . . . with any other person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage . . . ."[4] The statute does not provide for continuing involvement by the department when guardianship is placed with a third party. Indeed, it is important to note that in § 46b-129 (j) (2) (D), the legislature clearly provided that the court can order continued involvement by the department in some situations. Specifically, § 46b-129 (j) (2) provides "[u]pon finding and adjudging that any child or youth is uncared for, neglected or abused the court may . . . (D) place the child or youth in the custody of the parent or guardian with protective supervision by the Commissioner of Children and Families subject to conditions established by the court." The fact that the legislature did not include such language in the provision regarding legal guardianship further supports our understanding that the department's involvement ends when legal guardianship is placed with a third party.

In the present case, it is undisputed that the court issued temporary specific steps to the respondent pursuant to § 46b-129 (c) at the initial hearing, and that the department provided reunification services to her through the hearing on the neglect petition. *In re Natalie S.*, supra, 165 Conn. App. 619 n.12. At the hearing, the respondent did not seek either custody or guardianship of Natalie, presumably because she recognized that she was not then, and might not ever become, a suitable candidate for those responsibilities. Id., 620 n.13. The respondent did not appeal the decision of the trial court not to award custody and guardianship to her. Id. As a result, the trial court adjudicated Natalie neglected, vacated the order of temporary custody to the department, and granted "temporary/nonpermanent custody and guardianship" to the father.

On the basis of the foregoing, we conclude that the trial court properly awarded legal guardianship of Natalie to the father and, despite being statutorily authorized

to do so, did not order continuing supervision by the department. Although the trial court used the phrase "temporary/nonpermanent custody and guardianship," we conclude that the trial court's decision not to order continuing supervision is controlling and demonstrates the trial court's recognition that the state's involvement in Natalie's life would cease. Accordingly, we conclude that the petitioner's involvement with Natalie has ceased, the case was closed, and the department was not required to continue providing reunification efforts to the respondent once guardianship was transferred to the father. See *Fish* v. *Fish*, 285 Conn. 24, 83, 939 A.2d 1040 (2008) ("The periodic judicial review described in § 46b-129 applies only if the child is committed to the custody of the department. The legislature . . . did not contemplate mandatory, periodic judicial review of cases in which custody, rather than ordered as a commitment of the child to [the department, has] been vested by the court in an appropriate third party . . . ." [Emphasis omitted; internal quotation marks omitted.]); see also *In re Pedro J. C.*, 154 Conn. App. 517, 538–39, 105 A.3d 943 (2014) ("[a] transfer of guardianship to someone other than a parent results in the cessation of any requirement that reunification efforts be made, and we fail to see how reunification, when contemplated in state child protection proceedings, remains viable when no state agency is authorized to make reasonable efforts toward reunification").

The respondent asserts that because her parental rights have not been terminated, she retains her fundamental constitutional right to family integrity and that the department is required to make efforts to protect that right. This court has repeatedly recognized that "[c]oncomitant reunification efforts on the part of the parents and the department help to preserve the integrity of the family and are based on the well settled notion that [t]he right of a parent to raise his or her children [is] recognized as a basic constitutional right." (Internal quotation marks omitted.) *In re Leah S.*, 284 Conn. 685, 696, 935 A.2d 1021 (2007). In the present case, the respondent asserts that family integrity would be preserved by continuing the department's involvement with the family by continuing reunification efforts for her. We disagree.

It is axiomatic that, once a child has been adjudicated neglected, the dispositional decision must be based on the best interest of the child and that the interest of the child and the parent may diverge. See *Santosky* v. *Kramer*, 455 U.S. 745, 760, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) ("[a]fter the [s]tate has established parental unfitness at that initial proceeding, the court may assume at the dispositional stage that the interests of the child and the natural parents do diverge"). In the present case, the trial court determined that awarding guardianship to the father was in the best interest of the child. That finding is not a subject of this appeal.[5]

Indeed, this court previously has recognized that if a child is in the custody of the petitioner an out-of-state parent may be an appropriate placement. See *In re Emoni W.*, 305 Conn. 723, 741, 48 A.3d 1 (2012).

Once both guardianship and custody were granted to the father in the present case, he and Natalie had a constitutional right to family integrity. As this court has recognized, "[t]his right to family integrity includes the most essential and basic aspect of familial privacy— the right of the family to remain together without the coercive interference of the awesome power of the state." *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 284, 455 A.2d 1313 (1983). Accordingly, we cannot conclude that continued involvement by the department in the form of reunification efforts for the respondent would be consistent with the constitutional right to family integrity. To the contrary, we agree with the Appellate Court, which concluded as follows: "The result of the trial court's disposition is that although the father currently has custody and guardianship of Natalie, and family integrity is preserved to the maximum extent possible in the specific circumstances of this case, the respondent has not lost her right to attempt to modify the court's order to obtain a transfer of custody and guardianship to her by persuading a court that doing so is in the best interest of Natalie." *In re Natalie S.*, supra, 165 Conn. App. 618–19.

Accordingly, we agree with the Appellate Court that the trial court correctly determined that continuing reunification efforts for the respondent were not required because temporary custody and guardianship had been placed with the father.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

[1] For the sake of consistency with the Appellate Court opinion, we hereinafter refer to Heather S. as the respondent, to Matthew B. as the father, and to the minor child as Natalie. See *In re Natalie S.*, 165 Conn. App. 604, 607 n.1, 139 A.3d 824 (2016).

[2] Pursuant to Practice Book § 67-13, the attorney for the minor child filed a statement on November 7, 2016, adopting the briefs filed by both the petitioner and the father.

[3] General Statutes § 17a-111b provides: "(a) The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required pursuant to subsection (b) of this section or subsection (j) of section 17a-112, or (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129.

"(b) The Commissioner of Children and Families or any other party may, at any time, file a motion with the court for a determination that reasonable efforts to reunify the parent with the child are not required. The court shall hold an evidentiary hearing on the motion not later than thirty days after the filing of the motion or may consolidate the hearing with a trial on a petition to terminate parental rights pursuant to section 17a-112. The court may determine that such efforts are not required if the court finds upon clear and convincing evidence that: (1) The parent has subjected the child

to the following aggravated circumstances: (A) The child has been abandoned, as defined in subsection (j) of section 17a-112; or (B) the parent has inflicted or knowingly permitted another person to inflict sexual molestation or exploitation or severe physical abuse on the child or engaged in a pattern of abuse of the child; (2) the parent has killed, through deliberate, nonaccidental act, another child of the parent or a sibling of the child, or has requested, commanded, importuned, attempted, conspired or solicited to commit or knowingly permitted another person to commit the killing of the child, another child of the parent or sibling of the child, or has committed or knowingly permitted another person to commit an assault, through deliberate, nonaccidental act, that resulted in serious bodily injury of the child, another child of the parent or a sibling of the child; (3) the parental rights of the parent to a sibling have been terminated within three years of the filing of a petition pursuant to this section, provided the commissioner has made reasonable efforts to reunify the parent with the child during a period of at least ninety days; (4) the parent was convicted by a court of competent jurisdiction of sexual assault, except a conviction of a violation of section 53a-71 or 53a-73a resulting in the conception of the child; or (5) the child was placed in the care and control of the commissioner pursuant to the provisions of sections 17a-57 to 17a-60, inclusive, and section 17a-61.

"(c) If the court determines that such efforts are not required, the court shall, at such hearing or at a hearing held not later than thirty days after such determination, approve a permanency plan for such child. The plan may include (1) adoption and a requirement that the commissioner file a petition to terminate parental rights, (2) transfer of guardianship, or (3) for a child sixteen years of age or older, such other planned permanent living arrangement as may be ordered by the court, provided the commissioner has documented a compelling reason why it would not be in the best interests of the child for the permanency plan to include one of the options set forth in subdivision (1) or (2) of this subsection. The child's health and safety shall be of paramount concern in formulating such plan. If the permanency plan for a child sixteen years of age or older includes such other planned permanent living arrangement pursuant to subdivision (3) of this subsection, the provisions of subdivisions (3) to (5), inclusive, of subsection (k) of section 46b-129 shall be applicable.

"(d) If the court determines that reasonable efforts to reunify the parent with the child are not required, the Department of Children and Families shall use its best efforts to maintain the child in the initial out-of-home placement, provided the department determines that such placement is in the best interests of the child, until such time as a permanent home for the child is found or the child is placed for adoption. If the permanency plan calls for placing the child for adoption or in some other permanent home, good faith efforts shall be made to place the child for adoption or in some other permanent home."

[4] General Statutes § 46b-129 (j) (2) provides, in its entirety, as follows: "Upon finding and adjudging that any child or youth is uncared for, neglected or abused the court may (A) commit such child or youth to the Commissioner of Children and Families, and such commitment shall remain in effect until further order of the court, except that such commitment may be revoked or parental rights terminated at any time by the court; (B) vest such child's or youth's legal guardianship in any private or public agency that is permitted by law to care for neglected, uncared for or abused children or youths or with any other person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage; (C) vest such child's or youth's permanent legal guardianship in any person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage in accordance with the requirements set forth in subdivision (5) of this subsection; or (D) place the child or youth in the custody of the parent or guardian with protective supervision by the Commissioner of Children and Families subject to conditions established by the court."

[5] On appeal to the Appellate Court, the respondent asserted that the trial court improperly granted custody and guardianship to the father without conducting an adequate investigation. The Appellate Court rejected the respondent's claim, stating "[o]n the basis of [the trial court's] findings, which the respondent does not claim were clearly erroneous, we cannot conclude that the trial court erred in declining to enter orders placing conditions on Natalie's placement with the father pursuant to its authority . . . ." *In re Natalie S.*, supra, 165 Conn. App. 626. In her petition for

certification to appeal to this court, the respondent sought to raise the issue regarding the trial court's alleged failure to conduct an adequate investigation. This court did not grant the petition for certification to appeal on this issue. See *Taylor* v. *Commissioner of Correction*, 324 Conn. 631, 653–54, 153 A.3d 1264 (2017) (refusing to review claim that "[t]he petitioner raised the first claim in his petition for certification, and this court specifically decided not to include it in its certified questions"); see also *State* v. *Cote*, 314 Conn. 570, 580–81, 107 A.3d 367 (2014) (declining to review claim that was beyond scope of certified question). The petitioner filed a motion to strike all portions of the respondent's brief addressing this issue, which this court granted. Accordingly, the issue of whether the judgment of the trial court granting custody and guardianship to the father was proper is not at issue in this appeal.