******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE BIANCA K.*
(AC 41819)

Lavine, Prescott and Bishop, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the trial court terminating her parental rights with respect to her minor child. *Held*:

1. The respondent mother's claim that the trial court erred in concluding that she failed to achieve the requisite degree of personal rehabilitation required by statute (§ 17a-112 [j] [3] [B] [i]) was unavailing; although the mother asserted, and the court acknowledged, that she had made substantial progress toward the completion of certain specific steps ordered by the court, the court reasonably found that the mother had failed to understand the impact of domestic violence on her and the minor child given the evidence concerning the mother's relationship with J, which was marked by a history of domestic violence and substance abuse, that she had continued to have a relationship with J notwithstanding his violent behavior, and that she failed to recognize the dangers that his violent history posed to her and her child, and although there was no specific step that precluded the mother from having contact with J, the court was not strictly bound by the enumerated specific steps when determining whether the mother had failed to rehabilitate, and the cumulative effect of the evidence presented was sufficient to justify the court's determination that the mother had failed to achieve sufficient personal rehabilitation as required by § 17a-112 (j) (3) (B) (i).

2. The respondent mother could not prevail on her claim that the trial court improperly determined that the termination of her parental rights was in the best interest of the minor child; that court made specific findings with respect to each of the seven factors delineated by statute (§ 17a-112 [k]), including finding that the termination of the mother's parental rights would provide the minor child with a consistent, stable, safe, and secure environment, and although the court found that the mother and the minor child shared a close bond, it was not clearly erroneous for the court to conclude that it was in the best interest of the minor child to terminate the mother's parental rights.

Argued January 3–officially released February 26, 2019**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Middlesex, Child Protection Session at Middletown, and tried to the court, *Hon. Barbara M. Quinn*, judge trial referee; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Ani A. Desilets*, with whom was *Lisa M. Vincent*, for the appellant (respondent mother).

*Benjamin Zivyon*, assistant attorney general, with whom, on the brief, were *George Jepsen*, former attorney general, and *Rachel Catanese*, legal intern, for the appellee (petitioner).

*Ellin M. Grenger*, with whom, on the brief, was *Rosemary J. Dempsey*, for the minor child.

*Opinion*

BISHOP, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights with respect to her minor child, Bianca K.[1] On appeal the respondent claims that the court improperly concluded that (1) by the clear and convincing evidence adduced at the termination hearing, she had failed to achieve sufficient personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B) (i), and (2) that the termination of her parental rights was in the best interest of the child. We affirm the judgment of the trial court.

The court found the following pertinent facts:[2] "On August 27, 2017, the [Commissioner] of Children and Families [commissioner] . . . filed a petition for the termination of the parental rights of [the respondent] . . . to [her] daughter, Bianca. The child was first removed from her parents on an order of temporary custody on July 1, 2014, when she was not yet three years old. She was returned to her mother about a year later under an order of protective supervision on July 30, 2015. She was removed for the second time on March 7, 2016, when testing revealed that her mother was still abusing illegal drugs and was generally noncompliant with the other conditions of protective supervision. Bianca has been in nonrelative foster care since that time. . . .

"[The respondent] is now twenty-eight years old and Bianca is her only child. She also experienced a dysfunctional family growing up, with [Department of Children and Families (department)] involvement and time spent in relative care during her childhood and teenage years. [The respondent's] mother has struggled with mental health and substance abuse issues. [The respondent's] two adult relationships with intimate partners have involved domestic violence and substance abuse, as well as mental health difficulties for herself and her partners. [The department] and the police have been involved with her at various times since [2014]. During much of this time, she has not been cooperative with [the department], conduct she shares with many children who have rejected [the department] due to the agency's involvement in their earlier lives. [The respondent] has not only been resistant to services, but secretive and quite misleading as to the details of her life.

"[The respondent] began using alcohol, marijuana and cocaine as a teenager in high school. She failed to graduate, although she believes she did quite well. However, she has not to this date earned her equivalency diploma. After she stopped going to school, she continued her cocaine use. She was arrested, convicted and incarcerated at age nineteen. After her child was born, she did not change her drug-abusing behavior. She broke up with the father of her child soon after

Bianca's birth and began a relationship with James P., someone she had known since high school. Bianca sees James as her father. James, like Bianca's biological father, has engaged in domestic violence toward Bianca and her mother and continues to be very heavily involved in drug abuse. He is a convicted felon and has been incarcerated a number of times. . . .

"[The respondent] and her child came to the attention of [the department] early in Bianca's life. Consistent with the policy of trying to keep families together, Bianca was not immediately removed from [the respondent's] care, yet the neglectful and potentially life threatening incidents did not end. The first event occurred in 2013 when Bianca was eighteen months old. She ingested Klonopin, which she apparently found loose in the back of her mother's car. [The respondent], when questioned, first denied it was her medication but later admitted that it was. Next, there was a police visit to the home where Bianca's grandmother reported that she had a fight with James P. and she was thrown to the ground, while James and [the respondent] held her there. They were all living in her house at that time. All three adults were reported to be intoxicated at that time, while Bianca was in the house. Next, in July of that year, when Bianca was not yet two, her grandmother apparently saw James P. strike Bianca. He was arrested for his conduct.[3] In March, 2014, when Bianca was two and [one-half years old], James was arrested for selling heroin from his car, while Bianca and her mother were in the car with him. [The respondent] admitted at that time to opiate abuse. In June of 2014, James broke into the house and attempted to strangle [the respondent]. . . . [I]n July, 2014, Bianca was treated for an overdose of Suboxone, her mother's pills, which she had found and ingested. She was very lethargic and was hospitalized. It was this last of these many neglectful events which brought about the first order of temporary custody and Bianca's removal from her mother's home and chaotic drug-impacted lifestyle.

"During the next year, [the respondent] attended programs to which she was referred for treatment of drug addiction, counseling, and domestic violence. She received parenting education and had regular visitation. As she testified [at] trial, [the respondent] did the things she was supposed to do, and said what she had to say in order to have Bianca returned to her care. She now admits she did not really change her behavior or internalize any of the behavioral changes needed.

"Bianca was returned home to [the respondent] in June, 2015, when she was not yet four years old. [Department] services continued for a period of time, but [the respondent's] participation was inconsistent. She participated in a child and family reunification therapeutic family time program, but was discharged when she attended less than half of the sessions. She also

did not consistently engage in therapy during this time. She did not routinely attend random urine drug screenings [and the department] was very concerned about her continued contact with James P., despite his known drug use and his documented abuse of Bianca. Fears about [the respondent's] own drug use and the lack of urine screenings made [the department] insist upon a hair test. When the test was completed in February, 2016, the test showed continued illegal opiate use, which [the respondent] denied. As was typical, she later admitted to such use. Bianca was again removed from her mother's care under an order of temporary custody, given her mother's behavior, continued drug use and lack of compliance with her specific steps. At the time of the removal in March, 2016, Bianca was four and one-half years old. . . .

"Bianca was placed in a [nonrelative] foster care home where she has remained since her removal from her mother's care in 2016. She has done well there, but as her foster mother testified, from time to time, she will become sad and want to go home to her mother. . . . It is apparent that Bianca remains closely attached to her mother with whom she enjoys a comfortable visiting relationship. It is a connection that she and [the respondent] both enjoy.

"As has been the case before, specific steps were issued for [the respondent] for services and programs in which to participate before she could be reunited with Bianca. These services include counseling, drug treatment and a component for her to understand the impact of domestic violence on her as well as its seriousness for her daughter and the potential for additional abuse in the future. As was the case in the past, [the respondent] attended fitfully with starts and stops. She successfully completed the drug treatment component of her specific steps and the various programs for such treatment. She has participated in parenting education and has done well." (Footnote added.)

The court addressed the respondent's continued relationship with James and her attempts to conceal the relationship from the department despite James' past violent conduct toward her and Bianca. It stated: "The court received a DVD into evidence, which shows [the respondent] and James at a Henny Penny and shopping at a market. It is very apparent that they are closely connected, as evidenced by their body language and the frequency with which the social worker randomly encountered them together in the community. The social worker's information makes [the respondent's] testimony about these events less than credible. One event took place when James' car broke down on an off-ramp. [The respondent] was seen by the social worker helping him and then they went to the Henny Penny for gas. Next, she saw them at a market shopping together. While they [entered] the store at separate times, while

shopping, the video shows them interacting and together. Neither of these events was disclosed by [the respondent] to [the department] until she was confronted. The court concludes that the two of them continue to be involved with each other in some fashion, and therein lies the problem.

"[The department] also received information from [the respondent's] neighbor in December, 2017, concerning James' presence in the home, which [the respondent] denies to this day. Specifically, the neighbor said that James was there regularly.[4] Certainly, the evidence is that a truck, which [the respondent] viewed as belonging to James, was registered and insured in her own name. The truck was parked next to the neighbor's part of the duplex in which [the respondent] resides. In addition, James is known to drink a certain alcoholic drink and an empty can of it was found outside [the respondent's] home in early 2018. While none of this information directly proves that James was present in the home, it strains the court's credulity, when combined with all the other evidence, to imagine that the two of them have not had regular contact. [The respondent] does admit that, from time to time, she and James share a meal and she continues to see nothing wrong with that contact. While [the respondent] certainly is entitled to have such friends as she finds appropriate, when her desire for maintaining an old and harmful friendship is in direct conflict with her desire to have Bianca returned to her care, concerns for Bianca's safety must remain paramount. It is clear from the evidence that Bianca cannot safely be returned home." (Footnotes added and omitted.) This appeal followed.

I

The respondent first claims that the trial court improperly concluded by clear and convincing evidence that she had failed to achieve sufficient personal rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i). Specifically, the respondent argues that the court, in concluding that she failed to rehabilitate, "undervalued" the substantial progress she made toward the completion of specific steps ordered by the court. Citing to her sobriety, her procurement of stable housing and an income, the completion of parenting classes, and the progress she has made in therapy, the respondent claims that she has in fact rehabilitated. We are not persuaded.

We begin by setting forth the applicable standard of review and relevant legal principles that guide our analysis. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more . . . grounds for termination of parental rights set forth in

§ 17a-112 [(j) (3)] exists by clear and convincing evidence. The commissioner . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. . . . If the trial court determines that the petitioner has failed to meet this high burden, it must deny the petition." (Citations omitted; internal quotation marks omitted.) *In re Mariana A.*, 181 Conn. App. 415, 427–28, 186 A.3d 83 (2018).

"Personal rehabilitation as used in [§ 17a–112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsible position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems. . . . Rather, [§ 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [the parent] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." *In re Lilyana P.*, 169 Conn. App. 708, 717–18, 152 A.3d 99 (2016), cert. denied, 324 Conn. 916, 153 A.3d 1290 (2017).

"Our Supreme Court has clarified that [a] conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the

judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous." (Internal quotation marks omitted.) *In re Damian G.*, 178 Conn. App. 220, 237, 174 A.3d 232 (2017), cert. denied, 328 Conn. 902, 177 A.3d 563 (2018). "A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Bauer* v. *Bauer*, 173 Conn. App. 595, 601, 164 A.3d 796 (2017).

We turn now to the application of this statutory and decisional law to the matter at hand. Although the court acknowledged in its findings that the respondent had made substantial progress with respect to the specific steps she relies on in her claim, the court concluded, as noted in its thorough and well reasoned memorandum of decision, that the respondent has failed to "understand the impact of domestic violence on her as well as its seriousness for her daughter and the potential for additional abuse in the future," as required by one of the specific steps provided to her after Bianca had been taken into the commissioner's temporary custody.[5] To support its determination, the court explained that the respondent has completely failed to understand that maintaining a relationship with James, platonic or otherwise, raises concern for Bianca's safety and is detrimental to the respondent's unification efforts. Indeed, the respondent, through counsel, conceded in her principal appellate brief that "the risk of Bianca being exposed to domestic violence is far greater with James in the picture, and this is precisely the reason why [the respondent] has not brought James around Bianca." Further, despite the respondent's insistence that she has had minimal contact with James, the court found the respondent's testimony to be entirely incredible and demonstrated that she was unable to understand why she could not have contact with James, that she has yet to acknowledge the harm James caused to her and Bianca, and that she even seemed to excuse James' violent behavior toward Bianca. On review, we are mindful of the principle that "[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014).

When construing the evidence available to us in a manner most favorable to sustaining the judgment of the trial court, it is apparent that the court's subordinate findings were not clearly erroneous and that the evidence was sufficient to support the court's conclusion that the respondent has failed to rehabilitate. The respondent does not dispute that she still maintains

a relationship with James and that she has not been forthcoming with the department about her repeated contact with him. To further support its conclusion, the court refers in its memorandum of decision to, inter alia, the respondent's deceitful conduct and failure to disclose that she was having contact with James, video evidence of the respondent and James shopping together, photographs of James' truck parked near the respondent's residence, an empty can of James' alcoholic beverage of choice outside of her home, and testimony from a neighbor that James frequently visits the respondent's home. Moreover, the court found credible a social study of the respondent performed by Kelly F. Rogers, a court-appointed psychologist. Specifically, the court found persuasive Rogers' assessment that the respondent was likely to take advantage of the goodwill of others and tended to blame others and her perceived unfair treatment to justify her actions.

Her contact with James notwithstanding, the respondent argues that her specific steps for reunification did not stipulate that she was to have no contact with James and that she is free to associate with whomever she wishes. Although there was no specific step that precluded contact with James, our Supreme Court has made clear that a court is not strictly bound by the enumerated specific steps when determining whether a parent has failed to rehabilitate. "Although . . . specific steps provide a benchmark by which the court measures whether either reunification or termination of parental rights is appropriate, the court necessarily will consider the underlying adjudication and the attendant findings." (Internal quotation marks omitted.) *In re Natalie S.*, 325 Conn. 833, 844, 160 A.3d 1056 (2017). "Specific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate." (Citation omitted; internal quotation marks omitted.) *In re Elvin G.*, 310 Conn. 485, 507–508, 78 A.3d 797 (2013). "Our Supreme Court has stated that [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Internal quotation marks omitted.) *In re Jazmine B.*,

121 Conn. App. 376, 390–91, 996 A.2d 286, cert. denied, 297 Conn. 924, 998 A.2d 168 (2010).

On the basis of the record and mindful of controlling law, we conclude that it was proper for the court, in deciding that the respondent had failed to rehabilitate, to consider the respondent's continued contact with James and her reluctance to accept that, given James' history of violence toward her and Bianca, his presence in the respondent's life posed a credible threat to Bianca's safety and demonstrated a lack of understanding of the impact of domestic violence on her and Bianca. Thus, on the basis of the cumulative effect of the evidence presented, there was sufficient evidence to establish the court's ultimate conclusion that the respondent failed to rehabilitate within the meaning of § 17a-112 (j) (3) (B) (i).[6]

II

The respondent next claims that the trial court improperly concluded that the termination of her parental rights was in the best interest of the child. Specifically, the respondent argues that because of the close bond shared between her and Bianca, termination of her parental rights is not in the best interest of the child. We disagree.

We begin our analysis by setting forth the relevant legal principles and standard of review. "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Athena C.*, 181 Conn. App. 803, 811, 186 A.3d 1198, cert. denied, 329 Conn. 911, 186 A.3d 14 (2018).

The court, in its memorandum of decision, made written findings regarding the seven factors. In its findings, the court acknowledged and considered the bond

between the respondent and Bianca in making its determination to terminate the respondent's parental rights. Nonetheless, "[o]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." (Internal quotation marks omitted.) *In re Daniel A.*, 150 Conn. App. 78, 104, 89 A.3d 1040, cert. denied, 312 Conn. 911, 93 A.3d 593 (2014). Such was the finding in the present case. Specifically, the court noted that termination of the respondent's parental rights would enable Bianca to grow up in a consistent, stable, safe, and secure environment where she would be able to overcome issues associated with her upbringing thus far. As a result, it was not clearly erroneous for the court to conclude that it was in the best interest of the child to terminate the respondent's parental rights even while recognizing the continuing bond between the respondent and Bianca.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** February 26, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The parental rights of Bianca's biological father were terminated in the same proceeding after he was defaulted for his failure to appear. He did not participate in this appeal.

[2] Pursuant to Practice Book § 63-4 (a) (2), the respondent certified that no transcripts were necessary for the resolution of this appeal. See also Practice Book § 63-8. As a result, our review of the record is confined to the trial court file, exhibits marked at trial, and the respective appendices submitted by the parties.

[3] James admitted to slapping Bianca in the face and was charged with risk of injury to a child.

[4] The court recognized that there were credibility issues concerning the neighbor's testimony, particularly because she withdrew some statements she made during her deposition. The court, however, determined that the "cumulative weight of all the tangential evidence and [the respondent's] general secretive and manipulative behavior and testimony . . . persuades the court that James P. is regularly present in her life."

[5] The record reflects that after the court had issued its second order of temporary custody of Bianca on March 7, 2016, the court issued several specific steps to the respondent to facilitate Bianca's return to her. Although none of these steps made explicit reference to James, one step required the respondent to make progress toward addressing the impact of domestic violence as part of her required counseling. It is clear from the record that the trial court found that the respondent's continuing relationship with James was strong evidence of the respondent's failure to adhere to this step.

[6] In its memorandum of decision, the court stated its belief that the respondent had been impregnated by James after being evaluated by the court-appointed psychologist. The respondent asserts that this was an erroneous finding by the court and that the record reflects only that she was impregnated and had her pregnancy terminated prior to her evaluation with Rogers. Even if this factual finding was made in error, this discrepancy alone does not demonstrate that the court's finding that the respondent had failed to rehabilitate was clearly erroneous. As previously set forth, the court relied on a plethora of other factual findings to determine that the respondent had failed to rehabilitate. Thus, we conclude that this finding, even if erroneous, does not erode our conclusion with respect to the court's factual findings regarding the respondent's failure to rehabilitate.

[7] The respondent also argues, without citing to any authority, that the

trial court committed "clear error" in considering the testimony of Bianca's foster mother, who stated that she would be willing to permit the respondent to continue to have contact with Bianca even after the termination of the respondent's parental rights. Specifically, the court stated: "In this case, the foster mother testified to her awareness of the child's connection to her mother and indicated her willingness to permit contact, even after termination, if that is the outcome." The respondent cannot demonstrate that this statement was integral to the court's analysis and ultimate conclusion that termination of the respondent's parental rights was in the best interest of the child. Rather, this statement appears to be an acknowledgement of the continuing bond between the respondent and Bianca. As previously noted, the strong bond between parent and child is not dispositive as to whether it is in the best interest of the child to terminate parental rights. Further, the trial court's memorandum of decision is replete with facts supporting the conclusion that termination of the respondent's parental rights was in the best interest of the child.

_____