******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE ARIELLA M. ET AL.*
## (AC 48293)

Seeley, Wilson and Lavine, Js.

*Syllabus*

The respondent father appealed from the trial court's judgment terminating his parental rights with respect to his minor children. He claimed, inter alia, that the court improperly determined that he had failed to achieve the requisite degree of personal rehabilitation required by statute (§ 17a-112 (j) (3) (B) (i)). *Held*:

This court determined that there was no practical relief it could afford the respondent father with respect to his claim that the trial court improperly found that he was unable or unwilling to benefit from efforts by the Department of Children and Families to reunify him with his children, as the father's claim was rendered moot because he challenged only one of the two independent bases in § 17a-112 (j) (1) for upholding the court's determination that the department had made reasonable reunification efforts without challenging the court's finding that those efforts themselves were reasonable.

The trial court's unchallenged factual findings, including findings regarding the respondent father's parenting ability, his failure to address the children's sexualized behavior and his volatile relationship with their mother, supported the court's determination, by clear and convincing evidence, that the father had failed to achieve such a degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (i) as would encourage the belief that, within a reasonable time, considering the children's ages and needs, he could assume a responsible caretaking and parentlng position in their lives.

The trial court properly determined, on the basis of abundant evidence in the record, that termination of the respondent father's parental rights was in the children's best interests, as the father did not challenge any of the court's findings in support of its best interest determination, including its

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

findings that the father had ignored the children's specific needs and disregarded the importance of stability and permanency in their lives.

Argued June 5—officially released August 18, 2025 **

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Litchfield, Juvenile Matters at Torrington, and transferred to the Superior Court in the judicial district of Middlesex, Child Protection Session at Middletown, where the cases were tried to the court, *Hon. Barbara M. Quinn*, judge trial referee; judgments terminating the respondents' parental rights, from which the respondent father appealed to this court. *Appeal dismissed in part; affirmed.*

*David B. Rozwaski*, assigned counsel, for the appellant (respondent father).

*Daniel M. Salton*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*James P. Sexton*, assigned counsel, for the minor children.

*Opinion*

WILSON, J. The respondent father appeals from the judgments of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his minor

** August 18, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

children,[1] Ariella M. and Emilia M.[2] On appeal, the respondent claims that the court improperly determined that (1) he was unable or unwilling to benefit from reunification efforts, (2) he failed to rehabilitate sufficiently, and (3) termination of his parental rights was in the children's best interests. We conclude that the appeal is moot as to the first claim and dismiss that portion of the appeal. We otherwise affirm the judgments of the trial court.

The following relevant facts and procedural history, taken from this court's decision in a related appeal by the children's mother, Cydney; see *In re Emilia M.*, 233 Conn. App. 565, A.3d (2025), petition for cert. filed (Conn. July 21, 2025) (No. 250121); were found by the trial court, or are otherwise undisputed in the record. "[The respondent] is . . . forty-eight years old. . . . Of significance is his long substance abuse history during which time he was heavily addicted to heroin. During those years, more than ten years ago, he was arrested and convicted of illegal sexual contact with a minor and remains under probation, [in] the [Department of Children and Families' (department)] [c]entral [r]egistry for investigation of sexual abuse of a minor and is also on the Connecticut sex offender registry. At present and for some time, he receives Suboxone for his addiction and has tested negative for any illicit substances in his urine screens since 2017, indicating no opiate or cocaine use, his probation officer testified at trial. [The respondent] was recently diagnosed with

---

[1] We note that the attorney for the minor children filed a statement with this court adopting the petitioner's brief.

[2] The trial court also rendered judgments terminating the parental rights of the minor children's mother, Cydney M., who filed a separate appeal, *not* challenging the termination of her parental rights but, rather, concerning the minor children's right to conflict free counsel. See *In re Emilia M.*, 233 Conn. App. 565, A.3d (2025), petition for cert. filed (Conn. July 21, 2025) (No. 250121). We hereinafter refer to the respondent father as the respondent and to Cydney M. by her first name.

post-traumatic stress disorder, attention deficit hyper-activity disorder and generalized anxiety disorder."

"[Cydney], who has been diagnosed with major depressive disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder, as well as opioid use in standing remission and borderline personality disorder . . . is now thirty-one years old, and her first child was born when she turned twenty-five. She met [the respondent], the father of her two children, approximately ten years ago, and they were married in 2015. . . . [The respondent] is some seventeen years older than [Cydney], and he has two adult children from earlier relationships. . . . [Cydney] and [the respondent] have had a volatile relationship marked with intimate partner violence and ongoing difficulties related to significant mental health issues and ongoing drug use by both. All who have counseled or interviewed the parents have spoken of a toxic relationship that is harmful to both of them but which they had not been able to set aside during the course of these proceedings. In the past, each has represented to [the department] and their therapeutic counselors that they were not in a relationship when, secretly, they remained involved with each other until very recently. . . . Ending their relationship was a necessary predicate to each of the parents' rehabilitation efforts, as their intimate partner violence and escalating arguments and fights negatively impacted their two daughters and were a continuing source of trauma for the children.

"During the time between the birth of Ariella, the oldest child, in 2018, and September 12, 2022, when . . . orders of temporary custody with neglect petitions were filed [by the petitioner], there were a total of nine referrals to [the department] due to the ever escalating, more serious intimate partner violence and neglectful care of the two children, Emilia having been born in September, 2020. The difficulties and arguments that

arose between the parents were exacerbated by [Cydney's] mental health difficulties [and] her out-of-control behaviors and reflected the ever growing toxic relationship between [Cydney] and [the respondent].

"In August, 2022, the department received a referral from the children's maternal grandmother alleging that [the respondent] was touching the children inappropriately while the children were naked. [Cydney] apparently had videotaped the children in the nude demonstrating the alleged acts of sexual abuse by [the respondent] and accusing their father of touching them inappropriately.[3] [Cydney] subsequently admitted that she had coached the children. Following these events, the petitioner sought and received orders of temporary custody for the children, who were placed in the foster home of their aunt. . . . While in the home of their aunt, the children engaged in sexualized behaviors that became too difficult for their aunt to handle, which resulted in the children being separated, with Ariella being placed in the care of her maternal grandmother[4]

---

[3] "The trial court specifically found that the 'the police [had] reported to [the department] that [Cydney] had sexually exploited her children by taking videos of them on her cell phone in the nude. . . . [Cydney] also had sent similar videos to a friend, who also reported her to the police for 'kiddy porn.' It appeared that [Cydney] was regularly coaching the children to accuse [the respondent] of sexual abuse, as he was on probation and was a registered sex offender. She has several times admitted that she did coach them because of her concerns. She was arrested on December 1, 2022, [on] charges of possession of child pornography and promoting minor[s] [in an] obscene performance, as well as risk of injury to children. She was incarcerated at York Correctional Institution and subsequently released on bond. There is a full no contact protective order in place protecting the children from [Cydney], who, with the exception of one supervised visit during a psychological evaluation, has had no contact with her children since November, 2022, when a motion to suspend visitation was granted by the court. [Cydney] was ultimately convicted of these charges and sentenced to a period of incarceration from January, 2024, to June, 2024.' " *In re Emilia M.*, supra, 233 Conn. App. 569 n.5.

[4] "In March, 2024, the maternal grandmother could no longer take care of Ariella, who, ultimately, was placed in the same foster home as Emilia." *In re Emilia M.*, supra, 233 Conn. App. 570 n.6.

and Emilia ultimately being placed with a foster family." (Footnotes in original; internal quotation marks omitted.) *In re Emilia M.*, supra, 233 Conn. App. 568–70.

On March 6, 2023, the trial court, *Aaron*, *J.*, adjudicated the children neglected, committed them to the care and custody of the petitioner, and ordered specific steps for the respondent to take to facilitate the return of the children to him. The steps required, inter alia, that the respondent take part in counseling and make progress toward individual treatment goals; address intimate partner violence and domestic violence with a therapist; and cooperate with the service providers recommended for counseling, in-home support services, substance abuse assessment or treatment, and intimate partner violence services.[5] The specific steps further provided that the identified treatment goal for the respondent was to "[d]evelop insight into maintaining a household void of substance use, intimate

[5] The specific steps in their entirety required that the respondent keep all appointments set by or with the department; cooperate with the department's home visits; let the department know where he resides; immediately let the department know about any changes in the makeup of the household; take part in counseling and make progress toward identified treatment goals; accept in-home support services referred by the department and cooperate with them; submit to a substance abuse evaluation and follow the recommendations about treatment; submit to random drug testing; not use illegal drugs or abuse alcohol or medicine; cooperate with court-ordered evaluations or testing; get and maintain adequate housing and a legal income; comply with any restraining or protective orders or other appropriate safety plan approved by the department; address intimate partner violence and domestic violence with a therapist; not break the law; cooperate with the children's therapy; visit the children as often as permitted; inform the department of any person he would like the department to consider as a placement resource for the children; tell the department the names and addresses of the children's grandparents; sign releases allowing the department to communicate with service providers to check on his attendance, cooperation, and progress toward identified goals; sign releases allowing the children's attorney and guardian ad litem to review the children's medical, psychological, psychiatric, and/or educational records; and cooperate with the service providers recommended for counseling, in-home support services, substance abuse assessment or treatment, and intimate partner violence services.

partner violence, [and] abuse." On December 8, 2023, the petitioner filed petitions for the termination of the parental rights of both the respondent and Cydney with respect to the children, alleging that the parents had failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, given the age and needs of the children, they could assume a responsible position in their lives within a reasonable time. The trial on the termination of parental rights petitions was held over five nonconsecutive days in July and August, 2024.[6] The respondent and Cydney appeared, and each were represented by counsel. During the trial, the petitioner presented testimony from multiple witnesses, including Koren Kermashek, a clinician who provided treatment to the respondent; Kerin Foley, a licensed therapist and clinical social worker who provided couples counseling to the respondent and Cydney; Jessica Biren Caverly, a licensed psychologist who performed a psychological and parenting evaluation of the respondent and Cydney, which was admitted into evidence as exhibit H, as well as a neuropsychological evaluation of the respondent, admitted into evidence as exhibit I; Morgan McGinnis, a department social worker assigned to the case; and Eric Smith, a department social work supervisor involved in the case. The respondent presented testimony from Erin O'Brien, his probation officer, and also testified himself.[7]

[6] While the petitions were pending, Cydney filed a motion seeking a permanent transfer of guardianship of the children to their maternal grandmother. The trial on the termination petitions was consolidated with the hearing on the motion to transfer guardianship. In its memorandum of decision terminating both parents' parental rights, the trial court also denied Cydney's motion to transfer guardianship, concluding, inter alia, that "[t]he proposed placement would not foster the sustained growth, development and well-being of [the] two young girls, nor the continuity and stability of their environment."

[7] During the proceedings, counsel for Cydney also presented testimony from witnesses.

On October 7, 2024, the court, *Hon. Barbara M. Quinn*, judge trial referee, issued a memorandum of decision, in which the court found that the department had made reasonable efforts to reunify the respondent with the children and that the respondent was unable to benefit from reunification efforts. The court further found that the respondent had failed to achieve an appropriate degree of personal rehabilitation as would encourage the belief that, within a reasonable time, he could assume a responsible position in the children's lives and determined that termination of the respondent's parental rights was in the best interests of the children. Pursuant to General Statutes § 17a-112 (j) (3) (B) (i), the court granted the petitions for the termination of the respondent's parental rights.[8] This appeal followed. Additional facts and procedural history will be set forth as necessary.

Before addressing the respondent's claims, we set forth the following relevant legal principles. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her

---

[8] The trial court also granted the petitions for the termination of Cydney's parental rights. See footnote 2 of this opinion.

child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun. . . .

"Section 17a-112 (j) provides in relevant part: The Superior Court, upon notice and hearing . . . may grant a petition . . . if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the [petitioner] for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .

"If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) *In re Autumn O.*, 218 Conn. App. 424, 430–31,

292 A.3d 66, cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023).

I

The respondent first claims that the trial court erred in its findings that he was unable or unwilling to benefit from reunification efforts. Specifically, the respondent claims that this finding is "clearly erroneous because there is no evidence contrary to the evidence of consistent employment, medication management, and compliance with probation." Moreover, he argues that the court focused on the " 'toxic relationship' " between the respondent and Cydney, which, "by itself, should not be the basis for a finding that the [respondent] is unable or unwilling to benefit from services." The respondent does not, however, challenge the court's determination that the department had made reasonable efforts to reunify him with the children. Because the respondent challenges only one of the two bases for the court's determination that § 17a-112 (j) (1) had been satisfied, we conclude that this portion of the respondent's appeal is moot.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . A case is considered moot if [the] court cannot grant the appellant any practical relief through its disposition of the merits . . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way. . . .

"Section 17a-112 (j) (1) provides in relevant part that the Superior Court may grant a petition [for termination

of parental rights] . . . if it finds by clear and convincing evidence that . . . the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent . . . *unless* the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . . In construing that statutory language, our Supreme Court has explained that, [b]ecause the two clauses are separated by the word unless, this statute plainly is written in the conjunctive. Accordingly, the department must prove either that it has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts. . . . [E]ither showing is sufficient to satisfy this statutory element. . . .

"Because either finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1) . . . in cases in which the trial court concludes that *both* findings have been proven, a respondent on appeal must demonstrate that both determinations are improper. If the respondent fails to challenge either one of those independent alternative bases . . . the trial court's ultimate determination that the requirements of § 17a-112 (j) (1) were satisfied remains unchallenged and intact. . . . In such instances, the appeal is moot, as resolution of a respondent's claim of error in her favor could not [afford] her any practical relief." (Citation omitted; emphasis altered; internal quotation marks omitted.) *In re Kharm A.*, 218 Conn. App. 750, 757–59, 292 A.3d 1286 (2023).

In the present case, the trial court found that the department had made reasonable efforts to reunify the respondent with the children *and* that he was unable or unwilling to benefit from reunification efforts. In his principal appellate brief, the respondent recognizes that the court determined that both findings had been

proven,[9] yet he failed to demonstrate that *both* determinations were improper. On appeal, the respondent challenges *only* the court's finding that he was unable or unwilling to benefit from the department's reunification efforts. Although the statement of issues in and introduction to his appellate brief reference the issue of whether reasonable efforts toward reunification were made, the respondent's brief is devoid of any legal analysis on this point. See, e.g., *Stubbs* v. *ICare Management, LLC*, 198 Conn. App. 511, 529–30, 233 A.3d 1170 (2020) (declining to review claim as inadequately briefed because it was referenced in plaintiff's brief only in statement of issues, introduction, and heading of argument section). In the context of his argument that the court erred in finding that he had failed to achieve a sufficient degree of rehabilitation, the respondent makes several references to the efforts the department made at reunification. These references, however, do not constitute an adequately briefed claim that the department's efforts were inadequate. See *In re S. G.*, 229 Conn. App. 834, 843–44 n.9, 328 A.3d 737 (2024) ("To the extent that those references . . . can be construed as a challenge to the court's finding that the department made reasonable efforts to reunify the respondent with the children, we conclude that such a claim is inadequately briefed and, therefore, decline to review it. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ('Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs.' ")).

---

[9] In his principal appellate brief, the respondent argued: "The trial court, in making its decision, found that the [department] had made reasonable efforts to reunify the [respondent], but due to continued mental health issues and the 'toxic relationship' with [Cydney] . . . the [respondent] was unable or unwilling to benefit in his reunification services . . . ."

Because the respondent failed to properly challenge the trial court's findings with respect to the two separate and independent bases set forth in § 17a-112 (j) (1), this court is unable to grant him any practical relief with respect to this claim. See *In re Kharm A.*, supra, 218 Conn. App. 759 ("[b]ecause the respondent challenges only one of the two separate and independent bases set forth in § 17a-112 (j) (1), there is no practical relief that this court can afford her with respect to her claim"). His claim, therefore, is moot. Accordingly, this portion of the appeal is dismissed.

## II

The respondent next claims that the trial court's determination that he had failed to rehabilitate sufficiently was unsupported by the evidence. We are not persuaded.

"Failure of a parent to achieve sufficient personal rehabilitation is one of [the] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. . . . Concerning the failure to achieve personal rehabilitation, § 17a-112 (j) (3) (B) (i) provides for the termination of parental rights when the minor child has been found to have been neglected, abused or uncared for in a prior proceeding and the parent of such child has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child.

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to [his] former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at

issue. . . . An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities. . . . Although the standard is not full rehabilitation, the parent must show more than any rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation. . . . [E]ven if a parent has made successful strides in [his] ability to manage [his] life and may have achieved a level of stability within [his] limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, [he] could assume a responsible position in the life of [his child]. . . .

"[T]he appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Citation omitted; internal quotation marks omitted.) *In re Mikhail M.*, 230 Conn. App. 86, 88–89, 328 A.3d 758, cert. denied, 351 Conn. 907, 330 A.3d 132 (2025).

In determining that the respondent had failed to rehabilitate sufficiently, the trial court found that, "although [the respondent] has engaged in therapy for many years, attended many of the services that were offered to him, his limitations are such that he has not benefited from those services nor learned to change his behavior in any meaningful way. His failure to separate from Cydney, even while she was incarcerated, lying to his therapist of many years about this central failure, indicates a man who goes through the motions of complying with

what is required of him while resisting and undermining any benefit from the services provided to him. Even if he were able to have his children in his care, the court concludes from the clear and convincing evidence that he has shown no signs of rehabilitation so that he could be expected to responsibly care for them and their needs in the reasonably foreseeable future." With respect to both parents, the court similarly found that "[n]either parent was ever able to comply with the steps ordered for them. The clear and convincing evidence demonstrates that neither has made sufficient progress for a long enough period of time to assume either one is stable, has adequately treated his or her mental health difficulties, including through medication. The intimate partner violence between them was evident until very recently, and whether they have finally ended their toxic relationship is still in doubt. The evidence demonstrates that this was so both on the adjudicatory date in December, 2023, and in the time that has elapsed since then. Whatever changes each may have achieved, it was unfortunately too little and too late for them to assume their children's care in the reasonably foreseeable future. Both children require stability and permanency. The court finds from the clear and convincing evidence that the grounds for termination of Cydney's and [the respondent's] parental rights have been proven by [the petitioner]."

In support of its conclusion, the trial court also focused on the intimate partner violence between the respondent and Cydney as well as the respondent's parenting ability. Specifically, the court found that, in the fall of 2022, the respondent and Cydney began attending couples counseling to preserve their marriage, during which "[t]he couples counselor tried to help Cydney and [the respondent] with their communications. She attempted to teach them to listen openly to each other, establish with people outside their marriage,

and deal with other marital issues. . . . Nonetheless, their relationship continued with toxic impact on each of their lives, to which their counselors testified at trial." Further, "[a]ll who have counseled or interviewed the parents have spoken of a 'toxic relationship' that is harmful to both of them but which they had not been able to set aside during the course of these proceedings. In the past, each has represented to [the department] and their therapeutic counselors that they were not in a relationship when, secretly, they remained involved with each other until very recently. Their representations were accepted by their counselors and featured significantly in the counselors' assessment of the parents' progress and their recommendations." (Footnote omitted.) As a result of the respondent's and Cydney's "ongoing and active concealment" of their relationship, the court found that assessments of the parents' progress "cannot now carry much weight, as the progress each counselor lauded had not in fact taken place," and "whether they have finally ended their toxic relationship is still in doubt."

With respect to the parenting ability of the respondent, the court relied on the opinion of Caverly, who testified and performed evaluations of the parents that were admitted into evidence. Specifically, the court stated: "In her opinion, both parents required further parenting education, and each of them needed to learn about implementing a wide range of discipline strategies for their daughters. Each needed to learn how to approach discipline now and when their children are older. In particular, it was imperative for them to learn how to address the unsafe behaviors she noted that each of them permitted during the parent-child portion of the evaluation. At that time, in January, 2023, [Caverly] continued to recommend that both children remain in foster care, as each parent had significant

mental health needs that were not being appropriately addressed. . . .

"[Caverly] performed a psychological parenting and interaction assessment with [the respondent] and the children. She noted that, while Ariella remembered him, Emilia seemed to have not much of a recollection of him in her life. [Caverly] recommended that he engage in parenting education and that [he] not only complete that education, but also be able to demonstrate his ability to better supervise his children. She was concerned about his cognitive functioning due to his long-term drug use and discrepancies in his test scores. She believed his limitations would make it more difficult for him to learn the material he needed to master and recall in order to parent successfully. She also found it of concern that Ariella's sexualized behaviors increased significantly after seeing [the respondent] in the evaluation, but those apparently abated after a time. [Caverly's] recommendations for [the respondent] also included his continued engagement in individual therapy and psychiatric medication management. Subsequent to the evaluation, he was referred to CT Kids Matter for parenting and offender counseling with his probation officer. At trial, he testified as to his present situation and his inability to assume primary care of his children." (Footnotes omitted.)

Moreover, specific to the children's sexualized behavior, the trial court found that "[b]oth Cydney and [the respondent] thought their daughters' behavior was normal and did nothing to intervene and redirect their children when they were engaging in such sexualized conduct."

Notwithstanding these factual findings, the respondent maintains that "there was more than sufficient evidence to make a determination that [the respondent], with continuing services, could, within a reasonable

period of time, make sufficient progress to reunify with his children." In support of this argument, he relies on evidence in the record reflecting that (1) despite the absence of visitation, Ariella was excited to see him, (2) Caverly recommended that the respondent see a neurologist to determine if there are any issues impacting his cognitive functioning that could lead to further recommendations to assist him, (3) he was compliant with various programs through probation, and (4) he was compliant with his medication regimen. In sum, the respondent argues that the evidence "clearly demonstrate[s] that the respondent . . . has been engaged in services, is making progress, and is committed to remaining engaged in services."

The trial court's decision makes clear that the court recognized that the respondent had engaged in therapy and many of the services offered to him; however, the court deemed the respondent's efforts to be "too little and too late for [him] to assume [his] children's care in the reasonably foreseeable future." As the court found, the respondent had failed to address the intimate partner violence between himself and Cydney, given their inability to separate and the subsequent concealment of their relationship. As a result of the respondent's and Cydney's "ongoing and active concealment" of their relationship, the court found that assessments of the parents' progress "cannot now carry much weight, as the progress each counselor lauded had not in fact taken place." The court also made findings as to the respondent's parenting ability and his failure to understand and address the children's sexualized behavior. The respondent does not challenge any of the court's subordinate findings.

Although there was evidence of progress on the part of the respondent, this does not undermine the trial court's reliance on its subordinate findings that demonstrate that he had failed to rehabilitate sufficiently. See

*In re Sheila J.*, 62 Conn. App. 470, 481–82, 771 A.2d 244 (2001) (court's determination that respondent failed to rehabilitate sufficiently was proper notwithstanding respondent's having demonstrated efforts and taken steps toward rehabilitation, which were "too little and too late"). We conclude that there is sufficient evidence in the record to support the court's determination that the petitioner had proven, by clear and convincing evidence, that the respondent failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the ages and needs of the children, he could assume a responsible position in their lives.

### III

The respondent's final claim is that the trial court improperly determined that terminating his parental rights was in the children's best interests. We disagree.

We begin our analysis by setting forth the relevant legal principles and standard of review. "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)].

. . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Bianca K.*, 188 Conn. App. 259, 273, 203 A.3d 1280 (2019); see also *In re S. G.*, supra, 229 Conn. App. 861–62 ("[a]n appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous" (internal quotation marks omitted)).

In the present case, the trial court addressed each of the factors set forth in § 17a-112 (k)[10] in the dispositional

[10] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

portion of its decision. The court made the following relevant findings. First, the department made reasonable efforts to provide timely services to both the respondent and Cydney, tailored to their needs. Specifically, the department required mental health services, substance abuse services, intimate partner violence services, and parenting services that "were offered to both [parents], and neither had benefited from them." Second, the department made reasonable efforts to reunite the respondent and the children in light of the services made available to the respondent, who "had more than adequate time and many services to assist [him] in [his] hoped for rehabilitation, but [he] was [not] able to achieve any substantial progress toward that goal." Third, the respondent failed to complete most of the specific steps ordered by the court and is "not in a position to safely care for [his] daughters within a reasonable period of time, as [he] [cannot] yet conduct [himself] in the manner required to parent these girls safely and provide for their emotional welfare." Fourth, "Emilia has developed significant emotional ties to her foster family, with whom she has lived for more than a year. . . . Ariella has not been with her new foster family for the same length of time as her sister. She is attached to her mother and to her [maternal] grandmother . . . to whose care she wishes to return." Fifth, Ariella was six years old, and Emilia was four years old at the time of trial. Sixth, the respondent was "prohibited from visiting with [his] children by court order and, except for contact during the evaluation, [had] not seen them since late 2022."

After discussing the factors set forth in § 17a-112 (k), the trial court found that "Cydney and [the respondent] are not able to have the children in their care, as Cydney admits she cannot care for them, and [the respondent] is in the same position. There is no question that these children, at six and four years of age, require permanent

and competent caretakers who can consistently and reliably deal with their special needs, their emotional requirements and provide daily loving care for both of them. . . . After considering Ariella's and Emilia's ages and the totality of circumstances, including the strength of Ariella's bond to her grandmother and the other familial connections, the court concludes, from the clear and convincing evidence, that, even despite Ariella's bond to her grandmother and also to her mother, termination of their parents' rights [with respect] to them is [in] these young girls' best interests." (Citation omitted.)

There is abundant evidence in the record to support the trial court's conclusion that it was in the best interests of the children to terminate the respondent's parental rights. Moreover, the respondent does not challenge any particular finding made by the court in support of its best interest determination. Rather, the respondent makes only two brief arguments in support of his claim that the court improperly determined that termination of his parental rights was in the best interests of the children, neither of which we find persuasive.[11]

First, the respondent argues that, by not allowing him to have continuing contact with his children, the

---

[11] The respondent raises an additional argument that warrants little discussion. He argues that "[m]ultiple placements of a child in nonrelative foster homes can have a destabilizing effect on the emotional welfare of a minor child. . . . [T]he two children reside in separate nonrelative foster homes, but . . . the maternal grandmother and maternal aunt are allowed to have contact through the foster parent. In light of the continuing contact with family members, there is no reason why a plan cannot be put [into] place to reestablish the relationship between the [respondent] and his children." (Citations omitted.)

This argument has no merit. We first observe that the respondent's assertion is inconsistent with the trial court's finding that the children have resided in the same fictive kin foster home since June, 2024, which counsel for the respondent conceded at oral argument. Moreover, the respondent fails to demonstrate how the continuing contact between the children and other family members is relevant to the question before us as to whether the trial court erred in terminating the *respondent's* parental rights.

termination of his parental rights will have a negative effect on the children and therefore is not in their best interests. Specifically, the respondent contends that he "loves his children and his oldest daughter, at least, has a positive recollection [of] her father, and, in light of [his] continuing efforts and work on his issues, it would be in the best interests of the minor children not to terminate parental rights but, rather, to remand the case to work on the [respondent's] relationship with his children so that the children will have a father who can be a part of their lives in some form." This argument "is inconsistent with our Supreme Court's repeated recognition of 'the importance of permanency in children's lives.' *In re Davonta V.*, [285 Conn. 483, 494, 940 A.2d 733 (2008); see id.] ('Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous stable home environments. . . . [S]table and continuous care givers are important to normal child development. Children need secure and uninterrupted emotional relationships with the adults who are responsible for their care.')." *In re Ja'La L.*, 201 Conn. App. 586, 596, 243 A.3d 358 (2020), cert. denied, 336 Conn. 909, 244 A.3d 148 (2021).

Second, the respondent argues that the trial court improperly based its best interest determination on its underlying finding that the children required "daily loving care" because "[t]he respondent . . . loves his children and wants to be able to have a loving relationship with his children, even if he cannot provide for the day-to-day care of his children. A requirement of providing day-to-day care is not a requirement of being a parent. . . . Even though the [respondent] will have to work at reestablishing his relationship with his children, it is in the children's best interests to allow the [respondent] to do so because they deserve the right to have a relationship with their father." (Citation omitted.) First, we disagree with the respondent's assertion that his

inability to provide the children with "daily loving care" was the basis for the court's best interest determination. A review of the court's decision makes clear that the court considered numerous factors in its determination, unchallenged by the respondent, including those found by the court pursuant to § 17a-112 (k).

To the extent that the trial court considered the respondent's ability to provide "daily loving care," however, the respondent's argument similarly disregards " 'the importance of permanency in children's lives' "; *In re Ja'La L.*, supra, 201 Conn. App. 596; and, moreover, ignores the specific needs of the children. The court made several findings as to the children's need for stability and permanency in the context of their particular circumstances. With respect to Ariella, the court found that "Ariella is considered a medically complex child due to her diagnosis of nephrotic syndrome, which is a kidney disorder. She needs caregivers to monitor her diet and follow medication administration directions from her physicians. She requires a parent who can coordinate and attend multiple appointments in a timely manner in order to ensure that Ariella's needs are met." Regarding both children, the court found that the intimate partner violence and escalating arguments between the respondent and Cydney were a continuing source of trauma for the children. Further, the court found that both children had been exposed to sexual conduct while in the care of their parents and became hypersexualized. The court found that both children continue with therapy to overcome the trauma they experienced in their family of origin. Considering the needs of the children, the court found that "these children, at six and four years of age, require permanent and competent caretakers who can consistently and reliably deal with their special needs, their emotional requirements, and provide daily loving care for both of them." The respondent does not challenge any of these

underlying findings as to the children's needs nor does he challenge the court's findings as to his inability to meet those needs.

Our review of the record demonstrates that the trial court properly considered the specific needs of the children and the abilities of the respondent in determining whether termination of his parental rights was in the best interests of the children. See *In re Ja'La L.*, supra, 201 Conn. App. 594, 597 (concluding that respondent's claim that she should have been permitted more time to rehabilitate before her parental rights were terminated ignored particular needs of children). To the extent that the respondent invites this court to second-guess the trial court's assessment that the children's need for permanency and stability outweighs the benefits of maintaining a connection between him and the children, he has not afforded us a basis on which to do so. See *In re Aubrey K.*, 216 Conn. App. 632, 671, 285 A.3d 1153 (2022) (reviewing court declined to second-guess trial court's best interest determination in light of facts that strongly support it), cert. denied, 345 Conn. 972, 286 A.3d 907 (2023). Accordingly, we conclude that the respondent has failed to demonstrate that the court erred in its determination that termination of his parental rights was in the children's best interests.

The appeal is dismissed with respect to the respondent's claim that the trial court erred in finding that he was unable or unwilling to benefit from the department's reunification efforts; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.